[No. A082058. First Dist., Div. Two. Jan. 12, 1999.]

DANIEL V. NGUYEN, Plaintiff and Appellant, v.
PROTON TECHNOLOGY CORPORATION et al., Defendants and
Respondents.

**COUNSEL**

Amamgbo, Emeziem, Ezeife & Ogbu and Kelechi Charles Emeziem for Plaintiff and Appellant.

Phillips & Spallas, Gregory L. Spallas and Diane J. Mason for Defendant and Respondent Proton Technology Corporation.

Pahl & Gosselin and Fenn C. Horton III for Defendants and Respondents Pahl & Gosselin and Fenn C. Horton III.

**OPINION**

**HAERLE, J.—**

## I.  INTRODUCTION

This appeal presents the interesting issue of the extent to which the absolute litigation privilege provided by Civil Code section 47, subdivision (b),[1] protects statements made in pre-civil-litigation demand letters or telephone calls which reflect discredit on individuals and are substantially

---

[1] Hereafter referred to simply as "section 47(b)."

extraneous to the threatened litigation. In reversing the summary judgment granted by the trial court in favor of the respondents, we hold that reasonable limits should and do exist on the type and character of prelitigation statements which are protected by the privilege.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Appellant was employed as sales representative of respondent Proton Technology Corporation (Proton) from approximately August 1995 until March 1996. Proton is a Fremont-based manufacturer of printed circuit boards. At least as of December 1995, appellant was employed by Proton through the Santa Clara County Probation Department's work furlough program. The only communication in the record to Proton from that department does not recite any offense committed by appellant which brought him to that probationary status, but respondents' appendix includes material establishing that appellant had, in 1995, pled guilty to shooting a gun at an unoccupied vehicle (Pen. Code, § 247, subd. (b)) and vandalism (Pen. Code, § 594, subds. (a) and (b)(2)).

In March 1996, appellant, along with several others, left Proton and became employed by a San Jose-based printed circuit board manufacturer, Excelsior Manufacturing, Inc. (Excelsior). Proton became concerned that Excelsior was improperly soliciting its employees and customers, and consulted its attorneys, respondent Pahl & Gosselin, about filing a lawsuit to stop Excelsior from so doing. Accordingly, respondent Fenn Horton III, a litigation attorney with Pahl & Gosselin, sent a fax letter to Manny Lee, the chief executive officer of Excelsior. Insofar as pertinent to this litigation, the letter read: "This law firm represents Proton Technology Corporation on a continuing basis in matters involving litigation. [¶] This letter is to provide clear warning to you that your company's recent acts of unfair competition will not be tolerated. Specifically, your employee, Tam Le Ta, has been raiding Proton's employees to induce them to go to work for Excelsior. Tam began his raiding activities while he was still employed by Proton. The day after Tam began working for your company, approximately 20 of Proton's production employees left to follow Tam in going to work for your company. In addition, a former Proton sales representative, Vinh Phuc Nguyen,[2] who recently began working for Excelsior, has been soliciting Proton's customers to induce them to switch their business to Excelsior. Vinh also began his wrongful solicitations while he was still an employee of Proton. We think you should be aware that Vinh was working for Proton under a work furlough program sponsored by the Santa Clara County Probation Department. Vinh was in prison for repeatedly and violently

---

[2]The name by which appellant was apparently employed by first Proton and then Excelsior.

assaulting his wife. . . . [¶] We have information to prove that Excelsior and these three[3] former Proton employees were involved in a conspiracy to injure Proton's business in violation of California Business & Professions Code § 17200 et seq. Excelsior's complicity in the conduct of Tam and Vinh also gives rise to tort liability under various common law causes of action. [¶] . . . [¶] Unless Excelsior's recent acts of unfair competition and misappropriation of trade secrets stops immediately, Proton intends to take full advantage of all of its legal rights in filing a lawsuit against Excelsior and obtaining injunctive relief, compensatory damages, as well as punitive damages and the reimbursement of its attorney's fees. We trust that this warning will be sufficient to stop these recent acts of unfair competition."

This letter had been approved in advance by Proton's chief executive officer (CEO), Tony Wang. Indeed, it was Wang who advised Horton that appellant's conviction had been "for beating his wife."[4]

On April 2, Excelsior's attorneys briefly responded to Horton's letter. This response recited an unfamiliarity with the details alleged by Horton, but generally denied his allegations of wrongdoing and requested that further communications to either Excelsior or any of its current employees be via them.

In early April, Attorney Horton initiated communications with one Joseph Martinez of the Santa Clara County Probation Department, appellant's probation officer. This tactic had also been suggested to him by Wang. In his declaration in support of respondents' motion for summary judgment, Horton stated that he informed Martinez that appellant had terminated his work furlough program with Proton and been hired by Excelsior. He also "expressed concern that [appellant] had engaged in tortious business activities on Excelsior's behalf." According to Horton's declaration, Martinez promised to investigate the allegations.[5]

Also early in April, Horton received a report on appellant's criminal record. In the process, he learned that he had been mistaken regarding the crimes for which appellant had been convicted. Several weeks later, on April

---

[3]In a portion of the letter not quoted here, Horton cited the activities of a third ex-Proton employee.

[4]On the same day, Horton also sent a fax letter to appellant which essentially reiterated the unfair competition charges pertinent to the latter, but without any reference to his criminal record.

[5]However, in the small portion of Martinez's deposition the parties have provided us, he testified that he would normally investigate a report or complaint from an employer about an employee on a work furlough program only "if we view it as a danger to the community. . . . Otherwise . . . we don't get involved in . . . a civil-type thing."

22, he wrote Excelsior's attorneys as follows: "This letter is to correct an error made in my letter to Manny Lee dated March 29, 1996, concerning Proton Technology's accusations of unfair competition. [¶] Although it is true that Vinh Phuc Nguyen was in the county jail when he was released to work at Proton Technology under a work furlough program in December 1995, Vinh Nguyen's conviction was for shooting a gun at an unoccupied motor vehicle and vandalism. Vinh Nguyen pled guilty to these felonies on October 31, 1995. [¶] If you have any questions, or wish to see the record of the conviction, please feel free to contact me."

On July 24, 1996, appellant filed a six-count complaint in Alameda County Superior Court. Included in the complaint were causes of action for libel, slander, invasion of privacy, intentional infliction of emotional distress, and interference with economic relationship. The complaint was directed entirely to the March 29 letter to Excelsior and the telephone conversation or conversations Horton had with appellant's probation officer, Martinez.[6] A demurrer was sustained without leave to amend as to the two causes of action for invasion of privacy; it was overruled as to the other four causes of action.

After discovery, respondents filed motions for summary judgment in November 1997. These motions asserted that Horton's several communications were either absolutely protected by the litigation privilege of section 47(b) or, alternatively, qualifiedly privileged under Civil Code section 47, subdivision (c). The court granted both motions on the basis of the section 47(b) privilege.

Appellant filed a timely notice of appeal.[7]

### III. Discussion

Section 47(b) provides that a communication made "[i]n any . . . (2) judicial proceeding" is privileged. This privilege is absolute, not qualified, even when prelitigation communications are implicated. (See *Aronson v. Kinsella* (1997) 58 Cal.App.4th 254, 261-268 [68 Cal.Rptr.2d 305].)

---

[6] I.e., nothing was alleged, nor is any contention made here regarding, the April 22 letter to Excelsior's attorneys.

[7] Appellant's attorney did not, however, include the same in the appellant's appendix, as is required by California Rules of Court, rules 5.1(b) and 5.1(c), hence leading respondents to suggest it had not been supplied to us. And, as respondents point out, he failed to comply in many meaningful ways with other portions of those same rules, e.g., regarding what should be included in an appendix and how the same is to be organized and paginated. However, because of the importance of the issue raised by this appeal, we have reluctantly determined to rule on its merits rather than striking appellant's opening brief (no reply brief was filed on his behalf) and appendix.

Twice in this decade, our Supreme Court has explored both the purposes served and sorts of communications protected by the litigation privilege. ■ In the leading case of *Silberg* v. *Anderson* (1990) 50 Cal.3d 205 [266 Cal.Rptr. 638, 786 P.2d 365] (*Silberg*), the court explained the rationale of the privilege—then codified as section 47, subdivision (2)—as follows: "The principal purpose of section 47(2) is to afford litigants and witnesses [citation] the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions. [Citations.] [¶] Section 47(2) promotes the effectiveness of judicial proceedings by encouraging 'open channels of communication and the presentation of evidence' in judicial proceedings. [Citation.] A further purpose of the privilege 'is to assure utmost freedom of communication between citizens and public authorities whose responsibility is to investigate and remedy wrongdoing.' [Citations.] Such open communication is 'a fundamental adjunct to the right of access to judicial and quasi-judicial proceedings.' [Citation.] Since the 'external threat of liability is destructive of this fundamental right and inconsistent with the effective administration of justice' [citation], courts have applied the privilege to eliminate the threat of liability for communications made during all kinds of truth-seeking proceedings: judicial, quasi-judicial, legislative and other official proceedings. [¶] . . . [¶] Section 47(2) further promotes the effectiveness of judicial proceedings by encouraging attorneys to zealously protect their clients' interests. '[I]t is desirable to create an absolute privilege . . . not because we desire to protect the shady practitioner, but because we do not want the honest one to have to be concerned with [subsequent derivative] actions . . . .' [Citation.] [¶] Finally, in immunizing participants from liability for torts arising from communications made during judicial proceedings, the law places upon litigants the burden of exposing during trial the bias of witnesses and the falsity of evidence, thereby enhancing the finality of judgments and avoiding an unending roundelay of litigation, an evil far worse than an occasional unfair result. [Citations.] . . . [¶] For our justice system to function, it is necessary that litigants assume responsibility for the complete litigation of their cause during the proceedings. To allow a litigant to attack the integrity of evidence after the proceedings have concluded, except in the most narrowly circumscribed situations, such as extrinsic fraud, would impermissibly burden, if not inundate, our justice system. [Citations.] [¶] Given the importance to our justice system of ensuring free access to the courts, promoting complete and truthful testimony, encouraging zealous advocacy, giving finality to judgments, and avoiding unending litigation, it is not surprising that section 47(2), the litigation privilege, has been referred to as 'the backbone to an effective and smoothly operating judicial system.' [Citation.]" (*Id.* at pp. 213-215.)

■ The court also addressed the nature of the communications protected by the privilege: "The usual formulation is that the privilege applies to any

communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." (*Silberg, supra,* 50 Cal.3d at p. 212.) Later in this opinion, however, the court effectively conflated the last two factors into one: "The requirement that the communication be in furtherance of the objects of the litigation is, in essence, simply part of the requirement that the communication be connected with, or have some logical relation to, the action, i.e., that it not be extraneous to the action. A good example of an application of the principle is found in the cases holding that a statement made in a judicial proceeding is not privileged unless it has some reasonable relevancy to the subject matter of the action." (*Id.* at pp. 219-220.) Only this last "combined" *Silberg* factor is pertinent to this appeal, and we shall shortly return to it.

It is clear that whether a given communication is within the privilege is an issue of law, and not fact. "[W]here the facts and circumstances under which a defamatory publication was made are undisputed, the question of privilege is a matter of law." (*Costa* v. *Superior Court* (1984) 157 Cal.App.3d 673, 678 [204 Cal.Rptr. 1]; *Loomis* v. *Superior Court* (1987) 195 Cal.App.3d 1026, 1029-1030 [241 Cal.Rptr. 236].)

The Supreme Court's most recent venture into the litigation privilege was in *Rubin* v. *Green* (1993) 4 Cal.4th 1187 [17 Cal.Rptr.2d 828, 847 P.2d 1044] (*Rubin*). There, it made clear that the "litigation privilege" applies to prelitigation communications as well as those occurring during the course of actual litigation. In that case, Green, a resident of a San Bernadino County mobilehome park, had addressed a written "notice of intention to commence action," purportedly written on behalf of the several hundred residents of the park, to Rubin, one of its owners. In it, she listed 23 alleged defects in the operation of the park and asserted the availability of various federal and state law remedies. After two more pieces of correspondence between the attorneys for Rubin and Green, Rubin sued both Green and her attorneys alleging, inter alia, unlawful interference with contractual relations via the solicitation of the park's residents. (*Id.* at p. 1191.) The Supreme Court's opinion was directed to the limited issue of whether ". . . a defendant in an impending civil action may sue the attorneys for the opposing party on the ground that they wrongfully 'solicited' the litigation against him." (*Id.* at p. 1190.) It unanimously held that, as to Rubin's suit for damages, the answer was in the negative; the basis of the ruling was section 47(b). (4 Cal.4th at p. 1193.)

In the course of its opinion, the court noted that "[f]or well over a century, communications with 'some relation' to judicial proceedings have been

absolutely immune from tort liability" by section 47(b). (*Rubin, supra,* 4 Cal.4th at p. 1193.) It then went on to note, as it had three years earlier in *Silberg*, the policy reasons underlying the rule, principally protecting access to the courts. It then addressed the issue of whether the privilege protected *prelitigation* activities, and confirmed that it well could: "In light of this extensive history, it is late in the day to contend that communications with 'some relation' to an *anticipated* lawsuit are not within the privilege." (*Rubin, supra,* 4 Cal.4th at p. 1194.)[8]

More specifically, both before and after *Rubin,* several cases have held that prelitigation demand letters of the sort involved here may be privileged under the section. Possibly the earliest of these (and among those cited by the court in *Rubin*) was *Lerette* v. *Dean Witter Organization, Inc.* (1976) 60 Cal.App.3d 573 [131 Cal.Rptr. 592] (*Lerette*). Others include: *Fuhrman* v. *California Satellite Systems* (1986) 179 Cal.App.3d 408, 420-421 [231 Cal.Rptr. 113], disapproved on other grounds in *Silberg, supra,* 50 Cal.3d at page 219; *Financial Corp. of America* v. *Wilburn* (1987) 189 Cal.App.3d 764, 777 [234 Cal.Rptr. 653]; *Laffer* v. *Levinson, Miller, Jacobs & Phillips* (1995) 34 Cal.App.4th 117, 122-125 [40 Cal.Rptr.2d 233]; and *Aronson* v. *Kinsella, supra,* 58 Cal.App.4th at pages 261-266.

However, the privilege obviously cannot extend to *anything* that is written just because it is contained in a prelitigation demand letter, a point which brings us back to the passage in *Silberg* in which the two tenets regarding the relationship of the statements to the litigation are fused into one. The court's language, again, was that "the communication be connected with, or have some logical relation to, the action, i.e., that it not be extraneous to the action." A few lines later, it restated the requirement as being that the statement have some "reasonable relevancy to the subject matter of the action." (*Silberg, supra,* 50 Cal.3d at p. 220.)

This was not always the principle applied by our appellate courts. Pre-*Silberg*, there are several reported cases in which a very loose and general relationship between the statement and the putative litigation was deemed

---

[8]Recently, our colleagues in Division Three of this district have refined the *Rubin* principle by holding that it applies only where the privileged communication has "some relation to an imminent lawsuit or judicial proceeding which is *actually* contemplated seriously and in good faith to resolve a dispute, and not simply as a tactical ploy to negotiate a bargain." (*Edwards* v. *Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 36 [61 Cal.Rptr.2d 518].) We do not reach the interesting question of whether the principle articulated in *Edwards* applies here because (1) the trial court apparently did not consider it and we decline to do so in the first instance and (2) at least superficially the record suggests that Proton was seriously considering suing Excelsior. We do, however, suggest that it is an issue that may well be relevant on remand.

sufficient. Thus, in *Pettit* v. *Levy* (1972) 28 Cal.App.3d 484, 489 [104 Cal.Rptr. 650], the court wrote: "The publication need not be pertinent, relevant or material in a technical sense to any issue if it has some connection or relation to the proceedings." After quoting that sentence, the court in *Profile Structures, Inc.* v. *Long Beach Bldg. Material Co.* (1986) 181 Cal.App.3d 437, 442 [226 Cal.Rptr. 192], added: "Any doubt as to whether such relationship or connection existed must be resolved in favor of a finding of privilege." Finally, in *Cayley* v. *Nunn* (1987) 190 Cal.App.3d 300 [235 Cal.Rptr. 385], a case relied upon in the trial court's orders here, the court summarized the applicable rule to be: "The privilege is denied to any participant in legal proceedings only when the matter is so palpably irrelevant to the subject matter that no reasonable man can doubt its irrelevancy and impropriety." (*Id.* at p. 304.)

Whatever the pre-*Silberg* merits of these expansive views,[9] we think they are clearly outdated in view of the limitations we have quoted from that case. Additionally, even pre-*Silberg*, the appellate courts often found superficially litigation-related statements not protected by the privilege. *Younger* v. *Solomon* (1974) 38 Cal.App.3d 289 [113 Cal.Rptr. 113] is perhaps the most interesting such case. It was an action brought by one Kern County attorney against another. The respondent was one of 10 attorneys who had filed ethics charges against the appellant with the State Bar of California. Later, respondent filed a civil action against the appellant on behalf of one of the alleged victims of the latter's conduct. In the course of that action, the respondent filed extensive interrogatories, including one specifically referencing and incorporating the "ambulance chasing" State Bar charges. The appellant filed a cross-complaint seeking damages, contending that the publication via the interrogatory of the State Bar charges was tortious on several theories. (*Id.* at pp. 293-294.) The superior court granted summary judgment against the appellant on the basis of section 47(b). The Court of Appeal reversed, holding that "[p]ublication of these matters has no logical relation or connection with Mrs. Jenkins' action . . . . The terms 'related to' or 'connected with' necessarily require more than a remote relationship or common factual genesis between two otherwise unconnected subjects. To come within the privilege, the fact communicated itself must have some bearing on or connection with the subject matter of the litigation." (38 Cal.App.3d at pp. 301-302.)

Similarly, in *Kinnamon* v. *Staitman & Snyder* (1977) 66 Cal.App.3d 893 [136 Cal.Rptr. 321] (*Kinnamon*), disapproved on other grounds in *Silberg*,

---

[9]Not all pre-*Silberg* cases sustaining the privilege used such expansive terminology. In many others, the concept of "relevancy" (or some degree of it) was stressed. Thus, in *Lerette*, *supra*, 60 Cal.App.3d at page 576, footnote, 5, the court summarized the two pertinent requirements as meaning that "the offending communication be relevant to the judicial proceeding."

*supra*, 50 Cal.3d at page 219, the court ruled that the privilege could not be invoked to foreclose an action for infliction of emotional distress against a collection attorney. In an effort to collect a later-dishonored check given his client, the attorney had written the plaintiff a demand letter which, among other things, threatened to file a criminal complaint. Noting that such action contravened the Rules of Professional Conduct, the court distinguished *Lerette, supra*, 60 Cal.App.3d 573, and held that the "threat . . . cannot serve the purpose of litigation" because it could be a cause for professional discipline. (*Kinnamon, supra*, 66 Cal.App.3d at p. 897.)

Finally, in *Carney v. Rotkin, Schmerin & McIntyre* (1988) 206 Cal.App.3d 1513 [254 Cal.Rptr. 478] (*Carney*), the court disallowed another claim of litigation privilege asserted by yet another firm of collection attorneys. These attorneys had advised the plaintiff, once via telephone and again by a confirming letter, that a "bench warrant" had been issued for her because of her failure to appear at a judgment-debtor examination, and had demanded immediate partial payment of the judgment before they would "recall the Bench Warrant." (*Id.* at p. 1519.) Of course, no bench warrant had issued. Justice Kennard, writing for a unanimous panel, reversed a grant of a demurrer based on the section 47(b) privilege. Noting that the threats of the attorneys might, themselves, well be a misdemeanor (see Bus. & Prof. Code, § 6128), she observed that the apparent "purpose of defendant attorney's extrajudicial statements was to deceive plaintiff and thus obtain an advantage over her." As a consequence of both that and the lack of any apparent intention to effect a settlement, the court ruled the statements were not made "to achieve a purpose of the litigation . . . ." (*Carney, supra*, 206 Cal.App.3d at pp. 1522-1523.)

We think these cases, and several others discussed earlier, establish an important point for both litigants and attorneys concerning prelitigation demands and the like. That point is that section 47(b) does not prop the barn door wide open for any and every sort of prelitigation charge or innuendo, especially concerning individuals. Indeed, the Court of Appeal in *Lerette* anticipated exactly the problem which this case highlights when it cautioned: "We recognize that the fact that a suit eventually is filed does not protect all defamatory communications made prior to the filing. *But most potential abuse of this privilege for prelitigation communications can be prevented by enforcement of the relevancy requirement . . . .*" (*Lerette, supra*, 60 Cal.App.3d at p. 578, fn. 6, italics added.)

Or, as our colleagues in Division Three of this district recently noted (lifting ever so gently from the language of *Rubin*[10] in the process): "It is not too late in the day to establish the appropriate standards for extending the litigation privilege to communications made in anticipation of litigation." (*Edwards* v. *Centex Real Estate Corp.*, *supra*, 53 Cal.App.4th 15, 33; see also fn. 8, *ante*.)

■ This case presents facts eminently befitting that goal. We have no difficulty in holding that the inclusion in Horton's demand letter to Excelsior of references to appellant's criminal record falls outside of the section 47(b) privilege. In the first place, Horton's particularization of appellant's criminal history was simply incorrect. It was alleged that he had been "in prison for repeatedly and violently assaulting his wife." It turned out that he was not in prison, but only county jail, and then for convictions for shooting at an unoccupied car and vandalism.

More importantly, we think any "connection" between such a conviction and the civil unfair competition focus of Horton's demand letter is, to be charitable about it, tenuous. Respondents attempt to "connect" the statements regarding appellant's criminal record with the dispute by arguing that the former "may have persuaded Excelsior that [appellant] was more than capable of committing unfair business practices since he had been convicted of more serious crimes in the past." This contention borders on the specious. First, the "unfair business practices" of which Proton and its attorneys complained in their March 29 letter are not "crimes." Second, one's proclivity to engage in such practices is in no way, shape or form predictable by whether he (a) beats his wife (b) shoots at unoccupied cars, or (c) commits vandalism.

The only other "connection" respondents offer is equally attenuated: they contend that, "if Proton decided to pursue litigation," appellant's convictions would be relevant because, if he became a witness, such would be admissible to impeach him under Evidence Code section 788. Thus, informing Excelsior of this fact in advance might achieve the goal of "avoiding litigation." First of all, respondents overlook the fact that admission of a prior felony conviction in a civil action is very much subject to the exercise of a court's discretion under Evidence Code section 352. (See *Robbins* v. *Wong* (1994) 27 Cal.App.4th 261, 274 [32 Cal.Rptr.2d 337].) Second, it simply stretches credulity to the breaking point to believe that any part of respondents' motivation for including a reference to appellant's alleged wife beating was a desire to advise Excelsior that he might be subject to impeachment if used as a witness in a civil unfair competition action.

---

[10]See *Rubin*, *supra*, 4 Cal.4th at page 1194.

Rather, we think the reaction of Excelsior's Lee to the letter, i.e., that it was essentially "vindictive" behavior on the part of Proton and its attorneys, is not only reasonable but possibly the only reasonable interpretation. This is corroborated by the fact that only *after* writing it did Horton undertake to investigate appellant's criminal history.

Two of the pre-*Silberg* cases discussed above, *Kinnamon* and *Carney*, involved civil law disputes in which the challenged communication implicated, in one way or another, criminal law issues. In both, overly aggressive collection attorneys sent demand letters which, in one case threatened to initiate, and in the other misrepresented the existence of, criminal proceedings. In both, the courts denied application of the privilege. We think the broader import of these holdings is that the use of the criminal records of individuals in purely civil disputes such as that between Proton and Excelsior is and should be fraught with peril. That is, surely, why our Rules of Professional Conduct send this warning shot across attorneys' bows: "A member shall not threaten to present criminal . . . charges to obtain an advantage in a civil dispute."[11] (Rules Prof. Conduct, rule 5-100(A).)

For the foregoing reasons, we hold that the prelitigation demand letter's reference to appellant's prior criminal history was not privileged under section 47(b).

Which leaves only the other issue raised by the pleadings and ruling below, i.e., whether the telephone communication initiated by Horton with appellant's parole officer was privileged under the section. Concerning it, appellant's complaint[12] alleges that a Proton employee or agent stated to the parole officer that appellant (a) "stole defendant PROTON's trade secret [*sic*], information, and clients" and (b) "repeatedly and violently assaulted his wife."

As noted above, the tactic of contacting Martinez was suggested to Horton by Proton's CEO, Wang, who "wanted me to see if I could persuade NGUYEN's probation officer to tell NGUYEN to stop soliciting PROTON's employees and customers. . . ." This suggests rather strongly that Proton was not only ready but eager to use the access it fortuitously had to appellant's probation officer as leverage in a purely civil dispute with appellant and his new employer.

---

[11]By this reference, we are not suggesting that Horton's letter violated this rule, but only that the rule exemplifies the principle that adverting to criminal law matters in the course of purely civil disputes is strongly discouraged.

[12]There is precious little in the record provided by the parties as to the content of that conversation. Horton's declaration presents his version of it in four sentences, and neither party presents any part of Martinez's deposition relevant to the content of the telephone call or calls.

For the reasons discussed above, we hold that such a communication is also unprivileged.

## IV.   DISPOSITION

The judgment is reversed. Costs on appeal are awarded to appellant.

Kline, P. J., and Ruvolo, J., concurred.