Filed 12/29/20

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA



| | |
|---|---|
| ROBERT DZIUBLA et al., <br><br>     Plaintiffs and Appellants, <br><br>     v. <br><br> IGNATIUS A. PIAZZA II et al., <br><br>     Defendants and Respondents. | D076183 <br><br><br> (Super. Ct. No. 37-2018-00057391-CU-DF-NC) |

APPEAL from an order of the Superior Court of San Diego County, Timothy M. Casserly, Judge. Affirmed in part; reversed in part and remanded.

Greer & Associates, Curtis Keith Greer and C. Tyler Greer for Plaintiffs and Appellants.

Call & Jensen, William Paul Cole and Nilab Rahyar Tolton for Defendants and Respondents.


This appeal concerns a soured business relationship that devolved into a fight that was nothing if not personal. Plaintiffs and appellants Robert Dziubla and Linda Stanwood claim that defendant Ignatius Piazza II, owner of a Nevada firearms training facility, harassed and threatened them by publishing defamatory statements along with their personal identifying information and sending associates to invade their home. Piazza retorts that

plaintiffs conned him out of thousands of dollars and are now attempting to steal his property and chill his constitutional rights.

Cutting a path between these two extremes, the trial court appropriately distinguished protected from unprotected activities in evaluating Piazza's special motion to strike under California's anti-SLAPP statute (Code Civ. Proc., § 425.16)—which it granted in part and denied in part. With one important clarification as to the scope of protected activity, we reach the same conclusion.

That clarification involves so-called "doxing" allegations in the complaint—plaintiffs' claim that Piazza published private personal identifying information about them to thousands of gun enthusiasts as a thinly-veiled threat about what could happen if they continued to litigate the business dispute.[1] Although it was included in an otherwise-protected litigation "alert" that discussed the pending lawsuit, the doxing information was entirely extraneous to the court proceedings that were the ostensible subject of the communication. We thus reject Piazza's assertion that plaintiffs cannot meet the "minimal merit" standard on the anti-SLAPP motion because the doxing allegations would necessarily be barred by the litigation privilege in Civil Code section 47, subdivision (b). Under well-settled authority, the privilege does not extend to statements that bear no

---

[1]  "Doxing" is a relatively recent internet-based form of harassment that involves posting a target's private personal information online so it can be used by other parties—perhaps the poster's supporters or internet "trolls"—to attack the targeted individual. Despite fear that this serious intimidation tactic can even lead to physical assaults, countervailing concerns about freedom of speech have made appropriate government regulation difficult. (See generally MacAllister, *The Doxing Dilemma: Seeking A Remedy for the Malicious Publication of Personal Information* (2017) 85 Fordham L.Rev. 2451.)

reasonable relationship to any judicial proceedings on which the privilege is assertedly based.  Accordingly, we affirm in part, reverse in part, and remand for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

1.    *The Nevada Suit*

Defendant Piazza owns Front Sight, a firearms training and self-defense business in Pahrump, Nevada.  According to Piazza, Front Sight has taught tens of thousands of individual students and built up a membership of over 200,000 people.  Members receive e-mail communications to keep them informed on Front Sight developments and, of course, business promotions.

In 2012, Piazza was pursuing a loan for an ambitious expansion project that would transform Front Sight into a resort destination—complete with timeshare condominiums and a full-service conference center.  After he failed to secure a traditional bank loan, Piazza explored higher risk options and ultimately agreed to work with plaintiff Dziubla, who represented that his team could raise $75 million from foreign investors if Front Sight paid upfront installments to cover expenses.  By 2015, the amount Dziubla thought he could raise had decreased to $25 million.  One year later, he loaned Piazza about $6 million to get the project started.

Piazza's loan came from the Las Vegas Development Fund (LVDF), which is run by Dziubla and his wife Stanwood.  The loan agreement was subject to certain conditions that Dziubla and Stanwood allege Piazza breached in multiple ways.  LVDF filed a notice of default in September 2018 and Piazza then sued in Nevada to prevent foreclosure on the Front Sight property (among other relief).  That litigation is ongoing and provides the context for the dispute in this case.

3

2.    *The California Litigation*

Shortly after LVDF recorded a notice of default on Piazza's Nevada property, Dziubla and Stanwood began receiving disturbing visits at their California residence from two men, Danielo Quidang and Patrick Schneemann, who claimed to be private investigators.  According to plaintiffs, the men spied on their home, snuck onto their property to take pictures and videos, and yelled threats when plaintiffs confronted them.  Dziubla and Stanwood obtained restraining orders against the men.

The next month, Piazza published a manifesto characterizing Dziubla as an enemy to Front Sight.  This "Emergency Action Alert" (Alert) was posted on Front Sight's website and e-mailed to its 200,000 members.  In the Alert, Piazza described Dziubla as a "Lying, Two-Faced, Gun-Grabbing Hillary Clinton Supporting, Con Man" who was "attempting to STEAL Front Sight" through the Nevada suit.  The Alert used forceful—even violent— rhetoric and appealed for monetary contributions to Piazza's "litigation war chest."  Of particular significance in this case, Piazza also doxed Dziubla and Stanwood in the Alert by publishing their home address, pictures of their house, and photos of Dziubla including a close-up image of his face.  These pictures were taken by Quidang and Schneemann, who were allegedly hired by Piazza.

After learning about the Alert, plaintiffs filed this California lawsuit against Piazza, Quidang and Schneemann alleging a dozen causes of action that fall roughly into two categories:  (1) trespass and privacy claims concerning Quidang and Schneemann's activities on their property; and (2) defamation and harassment claims concerning Piazza's publication of the Alert.

4

Piazza challenged the defamation and harassment allegations under California's anti-SLAPP (strategic lawsuit against public participation) statute, arguing that the Alert was protected speech. (Code Civ. Proc., § 425.16.)[2] The trial court agreed, shifting the burden to plaintiffs to show minimal merit so that they could proceed on these claims. As to this second step of the anti-SLAPP analysis, the court largely agreed with plaintiffs *but for* their inability to overcome Piazza's primary defense: that the Alert was protected by the litigation privilege. As a result, the court granted most of Piazza's special motion to strike, effectively barring all of plaintiffs' claims that were based on the Alert (including the doxing allegations).

## DISCUSSION

In its broad outline, we largely endorse the reasoning of the trial court: Piazza's Alert, which provides the basis for virtually all of plaintiffs' challenged claims,[3] is protected by the anti-SLAPP statute because it was published in furtherance of Piazza's right to petition. (§ 425.16, subds. (a), (b)(1), and (e).) We likewise agree with the trial court that as to most of those claims, plaintiffs could demonstrate minimal merit but for their failure to overcome Piazza's litigation privilege defense. However, the privilege does not apply indiscriminately to everything included in the Alert just because that document broadly relates to litigation. As we explain in more detail, the doxing allegations should be treated separately from the rest of the challenged statements in the Alert. Publishing plaintiffs' personal information was in no way rationally related to litigation, and the disclosure of that information is not protected by the corresponding privilege.

---

[2] All subsequent statutory references are to the Code of Civil Procedure unless otherwise specified.

[3] See *post*, footnote 4.

5

Although we diverge from the trial court on this particular point, our decision has a limited effect. Only two causes of action that were previously stricken are revived in part by our analysis. The real effect of our decision is simply to clarify that it does not run afoul of the litigation privilege for plaintiffs to rely on the harm caused by Piazza's doxing activities as they attempt to prove the surviving causes of action.

1.    *Basic Anti-SLAPP Principles*

The anti-SLAPP statute enables defendants to quickly terminate meritless actions against them that are based on their constitutionally protected rights to speak freely and petition for redress of grievances. (§ 425.16.) It allows litigants to file a special motion to strike "at an early stage," in which the trial court uses a "summary-judgment-like procedure" to evaluate the claims.[4] (*Zhang v. Jenevein* (2019) 31 Cal.App.5th 585, 592.) In considering a special motion to strike, courts employ a two-step process. (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1061.) In the first step, defendants must show that the claims they challenge are based on conduct "aris[ing] from" an act that furthers their speech or petition rights. (§ 425.16, subd. (b)(1).) This includes, among other

---

[4]    As the Supreme Court was careful to emphasize in *Baral v. Schnitt* (2016) 1 Cal.5th 376 (*Baral*), the terms "cause of action" and "claim" can have different meanings depending on the context in which they are used, and both were employed by the Legislature in drafting section 425.16. (*Baral, supra*, at pp. 381–382.) With respect to the latter term, we follow *Baral*'s lead in using "claim" to refer to a set of facts allegedly giving rise to relief that constitutes a "proper subject of a special motion to strike." (*Id*. at p. 382; see also *id*. at p. 395 [anti-SLAPP motion is directed to "alleged acts giving rise to a claim for relief"].) We use "cause of action" to mean the separate counts as pleaded by the plaintiffs. A single cause of action can incorporate more than one claim; at the same time, a single claim can sometimes form the basis for more than one cause of action.

things, any "writing made in connection with an issue under consideration or review by a . . . judicial body." (§ 425.16, subd. (e)(2).)

If defendants can make this initial showing, the burden shifts to the plaintiffs in the second step to demonstrate a prima facie case that would enable them to prevail on the challenged claims. (*Baral, supra,* 1 Cal.5th at pp. 384–385.) Plaintiffs only need to show "minimal merit" to defeat the special motion to strike. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 94.) At this stage, "[t]he court does not weigh evidence or resolve conflicting factual claims . . . [but rather] accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law." (*Baral, supra,* at pp. 384–385.) Appellate courts independently review orders granting or denying a special motion to strike. (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1055 (*Rusheen*).)

2.  *Step One:  Plaintiffs' Claims Arise Out of Protected Activity*

In this section, we independently evaluate the nature of the Alert. We conclude that the first prong of the anti-SLAPP analysis is satisfied because the Alert (1) forms the basis for plaintiffs' claims, (2) relates to the Nevada litigation, and (3) does not fall within the exceptions that plaintiffs highlight. The first two points are not truly contested by plaintiffs, but we examine them in the course of our independent review.

a.  *The Alert forms the basis for plaintiffs' claims.*

As a preliminary matter, we note that Piazza's anti-SLAPP motion sought to strike only seven of plaintiffs' twelve causes of action, targeting the allegations dependent on the Alert and mostly avoiding those based on Quidang and Schneemann's activities at plaintiffs' house. The challenged causes of action included: (1) Criminal Threats, alleging that the "incendiary language" in the Alert and the "very nature of the distribution list" amounts

7

to a criminal threat against Dziubla; (2) Defamation, stating that the Alert falsely characterized Dziubla as a con man and a liar; (3) Privacy (False Light), claiming the Alert portrayed Dziubla in an offensive manner; (9) Negligent Infliction of Emotional Distress, alleging defendants owed a duty to plaintiffs that they breached by harassing, intimidating and defaming them; (10) Injunction, asking the court to order the Alert taken down from Front Sight's website; (11) Civil Conspiracy, claiming defendants conspired to harass plaintiffs; and (12) Violation of the Ralph Civil Rights Act of 1976 (Civ. Code, 51.7), alleging plaintiffs were targeted by Piazza based on their political affiliations. Our review of the complaint leads us to the same conclusion as the trial court; with one exception,[5] each challenged cause of action cites harms based at least in part on the Alert. (See *Baral, supra,* 1 Cal.5th 376, 396 [allegations arising in part from protected activity satisfy the first step in evaluating a special motion to strike].) We turn now to the more central question of the prong one analysis: whether the Alert constitutes protected activity.

b.    *The Alert is protected because it relates to litigation.*

The Alert itself is an erratic ten-page document. It starts as a progress report, transitions to an exposé, and ends as a fundraising solicitation. Piazza opens by explaining the status of the renovation project and how it will benefit Front Sight members. Dziubla is quickly introduced as a liar and a con man, and then Piazza "divulge[s] the details of his identity, where he lives, what he does, and how he hoodwinked us into falling for his scam."

---

[5]    The eleventh cause of action included the only set of challenged allegations that were untied to the Alert; it focused on defendants *meeting* together to conspire to harm plaintiffs. The trial court properly denied the motion to strike these allegations.

8

This is the section that includes Dziubla's residential address, photos of his home and a close-up picture of his face. According to Piazza, this information was included as evidence of Dziubla's con; he apparently claimed to be broke and asked Front Sight for more money, but all the while he owned a "million dollar home and [a] Lexus and brand new Mercedes Benz."

After this section, the focus of the document turns to funding the Nevada litigation. Piazza asks for monetary contributions and offers to reward members with "surplus credits, memberships, and certificates" that will be converted, in vague terms, to ownership interests in Front Sight when the renovations are complete. Piazza states these funds will be used for three purposes, to (1) "[d]estroy Dziubla by rapidly and aggressively prosecuting our lawsuit against him," (2) increase Front Sight marketing to grow the business, and (3) "increase the pace of construction" to quickly complete the resort.

Despite its vacillating nature, reading the Alert as a whole makes it clear that Piazza wrote and distributed the document in furtherance of his right to petition the Nevada courts for relief. (§ 425.16, subd. (b)(1).) The anti-SLAPP statute specifies that such an act includes "any . . . writing made *in connection with* an issue under consideration or review by a . . . judicial body." (§ 425.16, subd. (e), italics added.) We easily conclude the Alert was written and distributed in connection with the Nevada litigation. It returns again and again to the lawsuit, and even the most forceful language is contextualized to the court battle. Front Sight members can support Piazza and "destroy" Dziubla "by rapidly and aggressively prosecuting our lawsuit against him." The Alert even provides the Nevada court pleadings and encourages readers to review them. Its primary purpose seems to be explaining the litigation to Front Sight's members and asking for their

financial help.  (See *Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 821–822 (*Wilcox*) ["statements made in the context of exhorting [others] to contribute to the cost of pursing . . . litigation" provides a "strong showing those statements are rationally connected to the litigation itself"].)  Piazza is thus correct that allegations based on the principal content of the Alert fall under the protections of the anti-SLAPP statute.

    c.    *None of the exceptions cited by plaintiffs apply.*

Plaintiffs do not contest the general point that the anti-SLAPP statute protects litigation-related documents, but they argue the Alert falls outside of the statute's purview because it is both illegal and constitutes commercial speech.  In plaintiffs' view, these defects nullify any constitutional protection the Alert might otherwise enjoy.  Although plaintiffs have correctly identified two exceptions to the anti-SLAPP statute's reach, they have not demonstrated that either applies here.

As to illegal conduct, it is true that a special motion to strike cannot be used by a defendant whose allegedly protected activity was illegal.  (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 320 (*Flatley*).)  Plaintiffs argue this was the case, offering three separate theories of how the Alert was illegal.  They contend it was (1) a "terroristic criminal threat" under Penal Code section 422, (2) harassment under Code of Civil Procedure section 527.6, and (3) a fraudulent sale of securities.  But in the context of the case law, illegal means criminal and not merely a violation of some statute.  (*Mendoza v. ADP Screening & Selection Services, Inc.* (2010) 182 Cal.App.4th 1644, 1654 (*Mendoza*).)  Furthermore, it is not sufficient that the plaintiffs can reasonably *argue* or offer *some evidence* that defendant's conduct was unlawful.  Rather, at this early stage of the proceedings, the illegality exception applies only if the defendant's activity is "illegal as a matter of

10

law," meaning either the defendant concedes the point or the evidence "conclusively establishes" as much. (*Flatley, supra,* 39 Cal.4th at p. 320.) Neither occurred here. Piazza has never conceded that publishing the Alert constituted criminal conduct.[6] And the evidence is far from conclusive that the Alert was illegal under any of plaintiffs' theories.

Regarding the criminal threats theory of illegality, the statute plaintiffs highlight requires (1) a willful threat to commit a crime that would result in death or great bodily injury to another, (2) with the specific intent that it be taken as a threat by the victim, (3) which is so "unequivocal, unconditional, immediate, and specific" that it (4) causes the victim to be in sustained fear, and (5) that such fear is reasonable. (Pen. Code, § 422; *People v. Toledo* (2001) 26 Cal.4th 221, 228.) Plaintiffs select certain clauses from the Alert that they believe evidence a threat; we quote them in full to provide context:

> "I am going to need your help to not only stop [Dziubla] in his tracks, but also give him what he truly deserves for what he has done to us, while we come together as a group, 200,000 strong, to complete the resort in record time!"
> [¶] . . . [¶]
>
> "I'll bet it makes your blood boil as much as mine to think this traitor used the money we paid him that was supposed to support the Front Sight project and instead used it to support the gun-grabbing schemes of Hillary Clinton. This turncoat needs to be punished, to the full extent the law

---

6  Plaintiffs make much of the fact that Piazza was arraigned on a misdemeanor count for electronic harassment, to which he pleaded not guilty. The prosecutor did not pursue charges when Piazza agreed to remove the Alert from the Front Sight website. There was never any admission of guilt. We take judicial notice of the minute order and the stipulation and order related to Piazza's misdemeanor case, which is proper under Evidence Code section 452, subdivision (d). Three separate requests for judicial notice from both parties compile various other exhibits that we decline to notice. These are either improper for judicial notice, unhelpful to our resolution of the case, or both.

11

will allow, for what he has done to us and what he has done to you."  [¶] . . . [¶]

"Here's how we turn the tables on Dziubla and shove his dirty deeds against you right down his throat [. . . .]  [¶] Now that we filed our lawsuit, we press our prosecution of the litigation like a blitzkrieg and we do not ease our blistering legal attack until we have decisively won, forcing Dziubla into debtor's court to expose his assets for our collection or forcing him into financial ruin in bankruptcy court."  [¶] . . . [¶]

[Beside a check box for financial contributions:] "Yes, Dr. Piazza. I want you to destroy the lying, two-faced, gun-grabbing Hillary Clinton supporting, con man Robert Dziubla by rapidly and aggressively prosecuting our lawsuit against him to overwhelming victory."

Plaintiffs might have a colorable argument that this language *could be* interpreted as a threat, but that falls short of a necessary conclusion as a matter of law.  As seems apparent from context, the violent terms are not meant to be read literally.  Piazza describes destroying Dziubla, but only through court action.  His "ruin" will be financial, and his "punishment" will be "to the full extent the law will allow."  Given the consistent references to the lawsuit, we are unable to find anything that would qualify as an indisputable threat under Penal Code section 422.  (See *People v. Maciel* (2003) 113 Cal.App.4th 679, 683; quoting *People v. Solis* (2001) 90 Cal.App.4th 1002, 1023 ["A violation of [Penal Code] section 422 requires . . . the defendant [to] willfully threaten[] to kill or seriously injure another person."]; *United States v. Villavicencio-Burruel* (9th Cir. 2010) 608 F.3d 556, 562 ["[Penal Code] [s]ection 422's plain text demonstrates that it requires a threatened use of violent physical force against another person."]; *Toledo, supra*, at p. 228–229 [explaining that the specific, immediate and unequivocal language was added to Penal Code section 422 to bring it into constitutional

12

compliance]; *United States v. Kelner* (2d Cir. 1976) 534 F.2d 1020, 1027.) Although Penal Code section 422's elements are not applied formulaically, "the words actually used must constitute a threat in light of the surrounding circumstances." (*In re George T.* (2004) 33 Cal.4th 620, 636.) Plaintiffs have not conclusively established such a threat.

Cognizant of this deficiency, plaintiffs argue that Piazza's threat can only be understood in context, and that his dissemination of the Alert to 200,000 "gun enthusiasts" raised the specter of violent retaliation against Dziubla. In doing so, however, plaintiffs merely describe the inherent risks of doxing, and they ignore that a criminal threat requires specific intent. In addition to other disputed issues, Piazza's intent is contested; based on that alone, we can conclude that plaintiffs have not demonstrated the Alert contained a criminal threat *as a matter of law*.[7]

Plaintiffs rely on substantially the same arguments and cases when they suggest, in the alternative, that the Alert constitutes harassment under section 527.6. This is an odd selection of statutes, as it details the *procedure* for a party seeking a *civil* restraining order against an alleged harasser. But even if we construe this argument liberally and look to the criminal statute that Piazza was actually charged with violating—misdemeanor electronic harassment under Penal Code section 653.2—the evidence again falls short of establishing he was necessarily guilty of that crime. As the trial court noted, "charges are only charges—not a conviction."

---

[7] Plaintiffs press their point by citing two cases to support their position that the Alert was a "true threat," but neither comes close to holding that similar conduct amounted to a criminal threat as a matter of law. (See *Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228, 1246 (*Huntingdon Life Sciences*); *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coalition of Life Activists* (9th Cir. 2002) 290 F.3d 1058, 1062.)

Taking a slightly different tact in their last illegality argument, plaintiffs contend the Alert's offer of Front Sight credits and memberships was an unregistered sale of securities that violates both Nevada and federal law.  This suggestion, again, falls short of demonstrating a criminal act as a matter of law.  Instead, it raises a host of questions that are as yet undetermined—such as whether these were investments or donations and, if the former, whether any exemptions apply.  Some language suggests a donation; Piazza characterized his program as a "reward" to his "loyal and supportive member[s] for your faith in Front Sight and your financial support in overcoming the obstacles of litigation."  But other language suggests some kind of investment structure; "benefits" will grow in accordance with the level of participation.  Even assuming the program is more than a donation, it is unclear how various "credits" would later convert to ownership interests and when an ownership interest might mature:  "When it is time to turn over Front Sight Firearms Training Institute to you, I will allow you to trade in your surplus credits, memberships, and certificates for your percentage of ownership."  Piazza seems to have left this intentionally vague.  We agree with the trial court that "some of [the Alert's] language arguably involves the sale of securities"—but this is less than definitive as a matter of law.

On all of plaintiffs' theories, there is a "factual dispute as to the legality" of Piazza's actions in writing and distributing the Alert.  As such, his special motion to strike cannot be denied on those grounds.  (*Paul for Council v. Hanyecz* (2001) 85 Cal.App.4th 1356, 1367.)

Apart from framing the Alert as a crime, plaintiffs attempt to wrest this communication from the protective reach of the anti-SLAPP statute by asserting it falls within the statute's exception for commercial speech.  This exception, detailed in section 425.17, subdivision (c), states that section

14

425.16 "does not apply to any cause of action brought against a person primarily engaged in the business of selling or leasing goods or services" under specified conditions. It goes on to list the conditions that define the exception. (§ 425.17, subd. (c)(1)–(c)(2).) This added detail has aided courts in determining that the legislature intended to exclude " 'only a subset of commercial speech'—specifically, comparative advertising." (*FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 147; see also *All One God Faith, Inc. v. Organic & Sustainable Industry Standards, Inc.* (2010) 183 Cal.App.4th 1186, 1217.)

We are doubtful that Piazza's Alert can be fairly described as *primarily* an effort to sell goods or services, but even assuming it was the Alert does not contain the comparative advertising that marks the commercial speech exception. This requirement is described in subdivision (c)(1), which clarifies that the "statement or conduct" the plaintiff's claims arise from must "consist[] of representations of fact about [the defendant's] or a business competitor's business operations, goods, or services." (§ 425.17, subd. (c)(1).) To fall within the exception then, the harm plaintiffs allege would have to derive from Piazza's representations about his own business or a competitor's business. (See, e.g., *Mendoza, supra,* 182 Cal.App.4th 1644, 1652.) That is not the case here, where plaintiffs generally allege harm from defamation, harassment, and threats.

3.   *Step Two: Plaintiffs Failed to Show They Could Prevail on Most of the Claims*

In this section, we review the litigation privilege as applied to the facts of this case and conclude it defeats most—but not all—of plaintiffs' challenged claims. In particular, the doxing statements included in the Alert are not privileged.

15

a.      *The litigation privilege defeats most of plaintiffs' claims.*

In the second prong of the anti-SLAPP analysis, where plaintiffs must demonstrate the "minimal merit" of their claims, they must also show they can overcome any affirmative defense the defendant has raised. (*Dwight R. v. Christy B.* (2013) 212 Cal.App.4th 697, 715–716; *Bently Reserve LP v. Papaliolios* (2013) 218 Cal.App.4th 418, 434.) Here, the trial court determined that plaintiffs could probably show minimal merit as to most of their claims[8] except that they could not overcome Piazza's defense that the litigation privilege applies to the Alert. We likewise agree that the litigation privilege disposes of most of plaintiffs' challenged claims in the second part of the anti-SLAPP analysis.

The litigation privilege is a statutory protection that has been interpreted expansively. (Civ. Code, § 47, subd. (b); *Rubin v. Green* (1993) 4 Cal.4th 1187, 1194.) Although it is not a part of section 425.16, the privilege is often invoked in anti-SLAPP motions. (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 737.) It "applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." (*Silberg v.*

---

8      The exception to this was plaintiffs' first cause of action for criminal threats, which was pleaded under a criminal statute—Penal Code section 422—that does not create a private right of action allowing an alleged threat victim to sue. This court requested supplemental briefing on various related issues, none of which proved central to our resolution of the case. However, in the course of that briefing we received a related motion from plaintiffs to consider additional evidence under Code of Civil Procedure section 909. We ordered that the motion be considered in conjunction with the appeal. We now deny it, however, finding no reason to depart from established norms that section 909 should be used sparingly. (*Monsan Homes, Inc. v. Pogrebneak* (1989) 210 Cal.App.3d 826, 830.)

*Anderson* (1990) 50 Cal.3d 205, 212.)  Its purpose is to "afford litigants and witnesses free access to the courts without fear of being harassed subsequently by derivative tort actions, to encourage open channels of communication and zealous advocacy, to promote complete and truthful testimony, to give finality to judgments, and to avoid unending litigation." (*Rusheen, supra*, 37 Cal.4th 1048, 1063.)  These policy considerations are paramount, and courts recognize that guarding them by adhering to the privilege will "result[] in some real injuries that go uncompensated." (*Silberg, supra*, at p. 218.)  This is "simply part of the price that is paid" for free access to the courts.  (*Pettitt v. Levy* (1972) 28 Cal.App.3d 484, 488 (*Pettitt*).)  If the privilege applies, it cannot be set aside for any tort claim except malicious prosecution.  (*Rubin, supra*, at p. 1194.)

Because the privilege "attaches to any publication that has any reasonable relation to [a court] action and is made to achieve the objects of the litigation," we have little trouble concluding that the Alert generally falls under its broad scope.  (*Pettitt, supra*, 28 Cal.App.3d 484, 489.)  As discussed above, the Alert informed Front Sight members about the Nevada litigation and asked for their help to fund it.  As such, it was written and distributed to achieve the ends of Piazza's petition for judicial relief.  (See *Wilcox, supra,* 27 Cal.App.4th 809, 826 [third-party who distributed memorandum to raise funds for litigation "would have enjoyed an absolute immunity from suit under the litigation privilege" for her efforts if she had been a party]; see also *Costa v. Superior Court* (1984) 157 Cal.App.3d 673, 678; *Izzi v. Rellas* (1980) 104 Cal.App.3d 254, 262–263; *Rosenthal v. Irell & Manella* (1982) 135 Cal.App.3d 121, 126.)  However, the fact that the Alert generally falls under the litigation privilege does not mean everything within it is automatically protected.

17

b.    *The doxing allegations are not barred by the litigation privilege.*

Even when a document broadly relates to litigation, it may contain unrelated parts that do not find shelter in the privilege. When communications are "substantially extraneous" to the court proceedings, there are "reasonable limits" on the application of the privilege. (*Nguyen v. Proton Technology Corp.* (1999) 69 Cal.App.4th 140, 142–143 (*Nguyen*).)

The allegedly defamatory statements in this case meet the logical relation test because they serve the ends of the litigation. Impolite as his name-calling may read, Piazza would be hard pressed to tell his version of the story and request help from Front Sight members without the freedom to describe Dziubla as a liar and a con man.

Piazza's doxing disclosures are a different matter. There was simply no good reason to include Dziubla's home address, images of his house and a close-up picture of his face in a communication aimed at explaining the status of ongoing litigation and soliciting financial support. Piazza argues to the contrary, asserting that he "specifically referenced Dziubla's address and photos of his home to argue Dziubla was lying when he represented to Front Sight that he was broke." But the accompanying text, describing Dziubla's wealth based on the approximate worth of his home and possessions, had already accomplished this same purpose. Furthermore, the precise address is unnecessary and the pictures of the house hardly demonstrate Piazza's point; the home does not appear particularly lavish and the make of the cars, depicted in an unlit garage, is indiscernible. All this information really provides is an additional tool for a would-be harasser to find the right house. Piazza's failure to offer any justification at all for the close-up image of Dziubla's face underscores our conclusion.

18

We find *Nguyen, supra,* 69 Cal.App.4th 140, instructive due to its factual similarity. In that case, a company called Proton noticed a movement of employees and then customers to its competitor Excelsior and suspected improper solicitation. Nguyen was one of the employees who left Proton to join Excelsior. In a letter that threatened litigation, Proton advised Excelsior that Nguyen had been "working for Proton under a work furlough program sponsored by the Santa Clara County Probation Department [and] was in prison for repeatedly and violently assaulting his wife." (*Id*. at pp. 143–144.) This turned out to be inaccurate, and Nguyen sued Proton for libel. (*Id*. at p. 145.) The court gave measured consideration to whether the litigation privilege protected Proton, but ultimately concluded it did not because Nguyen's conviction history was unrelated to Proton's contemplated litigation with Excelsior. (*Id*. at p. 152.) "The terms 'related to' or 'connected with' necessarily require more than a remote relationship or common factual genesis between two otherwise unconnected subjects. To come within the privilege, the fact communicated itself must have some bearing on or connection with the subject matter of the litigation." (*Id*. at p. 149; quoting *Younger v. Solomon* (1974) 38 Cal.App.3d 289, 302.)

In this same vein, we conclude that the doxing information included in the Alert had no connection with, nor legitimate relation to, the Nevada litigation. As a result, it is not protected by the litigation privilege. Contrary to Piazza's contentions, this court is not bound to interpret "logical relation" so expansively that we cannot separate the wheat from the chaff. And as the *Nguyen* court observed, enforcing the relevancy requirement does not narrow the litigation privilege, but rather prevents its abuse. (*Nguyen, supra*, 69 Cal.App.4th 140, 150.)

19

4.  *Application on Remand*

In the preceding sections, we affirmed the principle that litigation-related communications such as the Alert fall under the protections of the anti-SLAPP statute in the first step of the analysis.  In the second step, we clarified the contours of the litigation privilege and concluded that the doxing allegations fall outside of its protections because those disclosures were unrelated to the Nevada litigation.  This last section functions to bring the discussion back to the practicalities of this case and clarify the effect of our decision on what remains of plaintiffs' case.

As we noted previously, the trial court granted Piazza's special motion to strike as to six of the seven causes of action he challenged:  Criminal Threats, Defamation, Privacy (False Light), Negligent Infliction of Emotional Distress, Injunction, and Violation of the Ralph Civil Rights Act of 1976 (Civ. Code, § 51.7).  Only two of these are revived by our decision because they specify the doxing disclosures as a source of injury, which we have determined provide a proper basis to proceed.

The first is the civil rights cause of action, which partially survived the anti-SLAPP motion.  In the words of *Baral*, this was a "mixed cause of action," in that it included allegations of both protected and unprotected activity.  (1 Cal.5th at p. 382.)  Because it considered the Alert protected by the litigation privilege, the trial court struck the allegations based on the Alert but declined to strike those based on Piazza's hiring of Quidang and Schneemann.  Our decision modifies this result so that the alleged civil rights violation evidenced by the doxing can still be developed by plaintiffs.

20

The second affected cause of action is plaintiffs' request for an injunction.[9]  Here, plaintiffs asked the court to order Piazza to take down the Alert from Front Sight's website, and it was stricken by the trial court under the same rationale—that the entire Alert was protected by the litigation privilege.  In the meantime, Piazza took down the Alert as part of a deal to avoid prosecution for a misdemeanor charge.  But as plaintiffs point out, the deal only requires Piazza's compliance for six months.  Given the personal and contentious nature of this dispute, the trial court should have the opportunity to consider whether an ongoing injunction to prevent Piazza from republishing the doxing information is warranted.

These are the only causes of action before us that are affected by our decision.  The others either did not rely on the doxing as a source of harm,[10] or suffer from some other defect.[11]  There were additional causes of action that Piazza did not challenge in his special motion to strike.  Those theories, of course, remain for plaintiffs to pursue.  And as we read the complaint, the

---

[9]    We pass over the debate whether a claim for injunctive relief is properly characterized as a "cause of action" or is rather a "remedy."  (See, e.g., *Guessous v. Chrome Hearts, LLC* (2009) 179 Cal.App.4th 1177, 1787.)

[10]    This was the case with the Defamation and False Light causes of action, which are based only on the alleged false statements about Dziubla in the Alert.

[11]    The cause of action for Criminal Threats and the Negligent Infliction of Emotional Distress both fall into this category.  As to Criminal Threats, plaintiffs essentially lack standing because the Penal Code violation they allege creates no right for plaintiffs to sue.  The cause of action for Negligent Infliction of Emotional Distress is simply unsupported by the facts as pleaded because plaintiffs alleged nothing to show there was a special relationship that created a duty of care.  (See *Huntingdon Life Sciences, supra,* 129 Cal.App.4th at p. 1264; *Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 984–985.)

doxing allegations were incorporated by reference into each cause of action. We mention this only to clarify that, where it is relevant, plaintiffs can invoke the doxing activity as evidence to support any of their remaining causes of action.

## DISPOSITION

The order granting the special motion to strike is reversed in part as to two of plaintiffs' cause of action – the tenth, seeking an injunction, and the twelfth, alleging a civil rights violation – but only as to the claims included in these causes of action that allege injury from the publication of their personal information, i.e., the doxing allegations.  In all other respects, the order is affirmed.  The matter is remanded to the trial court for further proceedings consistent with this opinion.  The parties shall bear their own costs on appeal.


DATO, J.

WE CONCUR:


HUFFMAN, Acting P. J.


HALLER, J.