Filed 6/27/25

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| FRANCIS WANG, Individually and as Trustee, etc., et al., <br><br>     Plaintiffs and Appellants, <br><br> v. <br><br> PETER PELETTA, Individually and as Trustee, etc., <br><br>     Defendant and Respondent. | A169968 <br><br> (Napa County <br> Super. Ct. No. 19CV00032) |

    Plaintiffs Francis Wang and Laura Young built a retaining wall on property in Napa County (the County, or Napa) in the late 1990's without first obtaining permits or a survey, apparently in the belief that the boundary between their property and an adjoining one ran along a barbed wire fence between them. Defendant Peter Peletta bought the adjoining property in 2013, and he later conducted a survey that showed the fence did not in fact mark the property line, and much of the retaining wall encroached on his property. Unable to resolve the matter amicably, the parties brought competing claims against each other in this action, and the trial court ultimately granted judgment in Peletta's favor.

---

    * Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part III of the Discussion.

On appeal, plaintiffs contend that (1) the trial court erred in granting a motion in limine to exclude evidence that they had a *prescriptive* easement to the portion of the property in dispute and (2) the evidence introduced at trial establishes an *equitable* easement as a matter of law. Disagreeing with plaintiffs on these points—and, in the unpublished portion of the decision, rejecting also their contention that the trial court erred in excluding evidence of allegedly defamatory statements Peletta made—we affirm.

## BACKGROUND

### I. Construction of Wall and Discovery of Encroachment

Wang purchased a residential property at 460 Stonecrest Drive in Napa in 1988. It shares a border with the property at 440 Stonecrest Drive, which Peletta bought in October 2013. A barbed wire fence running along a steep ravine marked what plaintiffs, and apparently the prior owner of Peletta's property, thought was the property line.

In the late 1990's, plaintiffs constructed a 295-foot long retaining wall, of heights up to 17 feet, together with electrical fixtures and a shed (collectively, the wall or the improvements), on their side of the barbed wire fence. There is no record of their obtaining permits before doing so. Unfortunately for all concerned, a survey Peletta conducted in August 2018 showed that a substantial section of the wall encroached upon the parcel he owns.

In November 2018, the County issued Peletta a citation and order to correct code violations for the portion of the wall on his property.

### II. This Action

In the operative second amended complaint, plaintiffs asserted causes of action that included quiet title (based on their alleged prescriptive easement and equitable easement over a portion of Peletta's property),

2

declaratory relief regarding their easement rights, and defamation. Peletta cross-complained, asserting a number of causes of action that included quiet title and trespass.

## III. Trial on Equitable Easement and Statement of Decision

The trial court conducted a bench trial on plaintiffs' cause of action for an equitable easement. In its statement of decision, it found as follows:

Plaintiffs continue to live at 460 Stonecrest Drive. Peletta bought the neighboring property " 'as is' " in 2013, but currently rents out the property and lives elsewhere.

Construction of the wall at issue was completed around 1999 or 2000. At that time, all involved parties thought the line between the two properties was along the barbed-wire fence, and plaintiffs believed the wall was well within their own property line. However, 270 feet of the wall were actually on Peletta's 440 Stonecrest property. Plaintiffs claim an easement of 11,388 square feet on Peletta's property to maintain the wall and the land on plaintiffs' side of the wall.

Before building the wall, plaintiffs did not obtain a permit. The trial court based this finding on the lack of documentary evidence in the County's files or elsewhere, and the absence of evidence regarding any payments made to the County or anyone else who constructed the wall. There was no evidence that a survey was carried out before the wall was constructed. And there was evidence that a survey would have been conducted as part of the permit process, and it would have revealed the true boundary of the two properties and prevented the encroachment.[1] Additionally, the County would

---

[1] On appeal, plaintiffs challenge the admissibility of the evidence that a survey would have been required as part of the permit process, but they have forfeited this objection by failing to raise it below. (See *Leonardini v. Shell*

3

have carried out inspections during construction to ensure the wall complied with applicable codes.

When they built the wall, Plaintiffs had already carried out other construction projects on their property that required permits: in 1988, Wang obtained a permit to install a gate across the driveway, and in 1998, plaintiffs applied for an after-the-fact permit for retaining walls constructed entirely on their own property. Plaintiffs also built other improvements on their property without permits and carried out unpermitted improvements encroaching onto another neighboring property in 2010.

The area of the encroachment at issue here is difficult to reach from the main part of Peletta's property, and there is no evidence any owner of his property had used the area, or that Peletta had plans to use it. In fact, he had never walked on that portion of his land before 2018.

Peletta obtained a survey of the property line in 2018, discovered the encroachment, called the County to ask about permits and, when he found there were none, reported the encroachment. The County issued citations for the unpermitted work in November 2018, identifying the fact that the wall was built without a permit as well as code violations for additional unpermitted work. In its current condition, the wall is stable and not at immediate risk of failure. However, it does not meet current building code requirements for seismic stability, drainage, and erosion control.

The code violations must be corrected, either by obtaining an after-the-fact permit or by removing the wall. At this point, the County cannot say whether it would issue an after-the-fact permit. Such a permit would require an application, structural design plans, and a drainage and erosion-control

_Oil Co._ (1989) 216 Cal.App.3d 547, 584 [we do not review admissibility of evidence absent timely objection].)

plan, including plans to address erosion on Peletta's property. It would also require changes to the wall, which might include retrofitting, to meet building code requirements. A permit application would require Peletta's sign-off, which he has not given.

Removal of the wall would also require permits, for grading and for construction of any new wall that might be built. Obtaining the necessary permits would take between three and 12 months, depending on the level of review necessary. Removing the wall and restoring the hillside would require six to eight months, and a total of 727 to 850 man-hours of work, and would cost in the range of $211,000 to $296,000.

Plaintiffs draw our attention to additional evidence in the record, including that they need Peletta's authorization before remedying any code violations on his property. Peletta is currently responsible for these violations, but plaintiffs have expressed their willingness to take responsibility for addressing all issues with permits and liability for the disputed improvements.

## IV.   Procedural History

The procedural history of this case is complicated, but we need not recite it in full, as only a few rulings are central to the issues on appeal.

Before trial, Peletta moved in limine to exclude evidence of prescriptive use of the disputed area. The trial court granted the motion on the ground the wall was a public nuisance because it was built without the required permits, and there can be no prescriptive right to maintain a public nuisance. The trial court then divided trial into two phases, the first phase being a bench trial on plaintiffs' claim to an equitable easement.

After hearing evidence, the trial court ruled in favor of Peletta on plaintiffs' claim to an equitable easement. On the facts we have summarized,

5

the trial court found plaintiffs had not established an equitable easement on three independent bases: plaintiffs' trespass was not innocent; defendant would be irreparably harmed by the easement; and plaintiffs' hardship in removing the wall would not be greatly disproportionate to the hardship to Peletta caused by granting the easement.

In preparation for the Phase 2 trial on the remaining claims, Peletta moved in limine to bar evidence or argument regarding communications between himself and governmental agencies on the ground they were protected by the privilege of Civil Code section 47, subdivision (b).[2] The trial court excluded most of the allegedly defamatory statements as privileged, and the remainder as nonactionable opinions.

It appears that the parties' remaining claims were resolved either through voluntary dismissal or by stipulated directed verdict. Without holding a Phase 2 trial, the trial court entered judgment quieting title against plaintiffs' easement claims and ordering plaintiffs to remove the encroachments (including the wall) and restore the hillside.

This timely appeal ensued.

## DISCUSSION

### I. Exclusion of Evidence of Prescriptive Easement

On procedural and substantive grounds, plaintiffs contend the trial court erred in granting Peletta's motion in limine to exclude evidence of a prescriptive easement.

Plaintiffs argue that a motion in limine is a disfavored means to dispose of a cause of action, and this dispute is not an appropriate vehicle for

---

[2] The communication primarily at issue, which we discuss in detail in the unpublished portion of this decision, was an e-mail Peletta sent to County officials and then forwarded to a neighbor.

6

that device. They draw our attention to *Johnson v. Chiu* (2011) 199 Cal.App.4th 775, 780–781, which explains that a motion in limine, made to exclude evidence before it is offered at trial, is not designed " 'to replace the dispositive motions prescribed by the Code of Civil Procedure,' " such as a motion for summary adjudication, but rather " ' "to avoid the obviously futile attempt to 'unring the bell' " ' " if a motion to strike is made before the jury.

Nevertheless, although appellate courts may be "wary of this tactic" (*Amtower v. Photon Dynamics, Inc.* (2008) 158 Cal.App.4th 1582, 1594 (*Amtower*)), it remains true that a motion in limine may be used to dispose of a cause of action or theory of recovery[3] in the exercise of the court's " 'inherent power to control litigation and conserve judicial resources.' " (*K.C. Multimedia, Inc. v. Bank of America Technology & Operations, Inc.* (2009) 171 Cal.App.4th 939, 951.) Disposing of a claim this way entails an increased risk of reversal, however, because the court's ruling remains subject to the appropriate standard of review on appeal. If, for instance, a motion in limine functions as a motion for nonsuit, the appellate court reviews an order granting that motion under the standard of review for a demurrer to the evidence, or nonsuit. (*Amtower*, *supra*, 158 Cal.App.4th at pp. 1594–1595; *Mechanical Contractors Assn. v. Greater Bay Area Assn.* (1998) 66 Cal.App.4th 672, 677.) That standard mandates that "all inferences and conflicts in the evidence be resolved in favor of the losing party and *against* the judgment." (*Amtower*, at p. 1594.) That is, the court may grant the

---

[3] The ruling regarding the prescriptive easement claim was directed to a single theory of recovery, rather than a cause of action, as the causes of action for quiet title and declaratory relief were founded on theories of both prescriptive and equitable easement. For that reason, the trial court had earlier declined to grant summary adjudication on these causes of action, despite concluding that Peletta's public nuisance defense was a complete bar to plaintiffs' claims based on prescriptive easement.

motion in limine only if, " 'disregarding conflicting evidence, viewing the record in the light most favorable to the plaintiff and indulging in every legitimate inference which may be drawn from the evidence, it determines there is *no* substantial evidence to support a judgment in the plaintiff's favor.' " (*Mechanical Contractors*, at p. 677.)

This standard of review applies here, where the trial court relied on the evidence before it, rather than the mere allegations of the pleadings. (See *Tan v. Arnel Management Co.* (2009) 170 Cal.App.4th 1087, 1094–1095.) On review of a ruling on a motion in limine that effectively acts as a motion for nonsuit, we are bound by the same rules as the trial court, resolving all inferences and doubts in plaintiffs' favor and upholding the ruling "only if it was required as a matter of law." (*Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 28 (*Edwards*); accord, *Tan*, at p. 1095.)

Even under these exacting standards, we conclude the trial court's ruling was correct. A prescriptive easement is established where the claimant proves "use of the property, for the statutory period of five years, which use has been (1) open and notorious; (2) continuous and uninterrupted; (3) hostile to the true owner; and (4) under claim of right." (*Main Street Plaza v. Cartwright & Main, LLC* (2011) 194 Cal.App.4th 1044, 1054.) Such an easement provides not *title*, but the right to make a specific *use* of someone else's property. (*Ibid.*)

Plaintiffs contend they would be able to establish these elements at trial; that is, that they could provide evidence that they openly constructed the wall and other encroachments on the disputed property and openly used the property to gain access to the encroachments; and that the encroachment has continued since the late 1990's without the true owner's permission and under claim of right. But despite the evidence they might be able to present

8

on these points, the record shows as a matter of law that plaintiffs did not gain a prescriptive easement.

That is because the wall and other encroachments were built without permits and as a result are—and have always been—a public nuisance subject to abatement. There is no dispute that plaintiffs were required to obtain permits before constructing the improvements. But there is no evidence in the record that plaintiffs applied for or received permits for the wall and other encroachments, and plaintiffs do not contend they could provide evidence of any such permits. The County's November 2018 citation to Peletta was based on the lack of permits for the retaining wall, storage building, electrical box, grading and earth disturbance, and earth-moving work. That citation gave Peletta the option of either submitting a complete building permit application, including a soils report, or removing the retaining wall and returning the area to its previous condition.

It is well established that "it is within the police power to declare an act or condition to be a nuisance for regulatory purposes." (*People ex rel. Dept. of Transportation v. Outdoor Media Group* (1993) 13 Cal.App.4th 1067, 1076; see Cal. Const., art. XI, § 7 ["A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws"].) A nuisance per se exists "when a legislative body with appropriate jurisdiction, in the exercise of the police power, expressly declares a particular . . . activity, or circumstance, to be a nuisance." (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1206.) That has happened here: The Napa County Code provides that "[i]t is unlawful and *a public nuisance* for any persons, firm or corporation . . . to erect [or] construct . . . any building or structure in the unincorporated territory of Napa County" without complying

9

with provisions that, plaintiffs do not dispute, required permits and compliance with applicable codes in building the wall and other improvements.  (Napa County Code, § 15.04.080, italics added.)

Courts in this state have long held that there can be no prescriptive right to maintain a public nuisance.  As our high court explained more than a century ago, "No lapse of time can legalize a public nuisance, and a prescriptive right cannot be maintained against a public nuisance where the action is brought by a citizen who has suffered special injury in consequence thereof.  [Citation.]  No right by prescription may be acquired to obstruct a sidewalk[,] . . . [n]or to maintain any other sort of nuisance."  (*Strong v. Sullivan* (1919) 180 Cal. 331, 334 (*Strong*), citing *Bowen v. Wendt* (1894) 103 Cal. 236, 238; see *Zack's, Inc. v. City of Sausalito* (2008) 165 Cal.App.4th 1163, 1183 (*Zack's*) [because alleged nuisance fits statutory definition of public nuisance, it cannot be time-barred]; Civ. Code, § 3490 ["No lapse of time can legalize a public nuisance, amounting to an actual obstruction of public right"].)

Plaintiffs acknowledge this principle but contend it has no application here because it is limited to public nuisances that are continuing, rather than permanent.  They rely upon *Mangini v. Aerojet-General Corp.* (1991) 230 Cal.App.3d 1125, 1142–1143 (*Mangini*), which explains that, despite section 3490, "where a private citizen sues for damage from a permanent nuisance, the statute of limitations begins to run on creation of the nuisance," but that where the alleged nuisance is a continuing one, "every continuation of the nuisance gives rise to a separate claim for damages caused by the nuisance."  And, they argue, the three-year statute of limitations governing a private party's nuisance action bars a claim that the encroachments constitute a nuisance.  (Code Civ. Proc., § 338, subd. (b); *Madani v.*

10

*Rabinowitz* (2020) 45 Cal.App.5th 602, 607 [limitations period for private nuisance claims turns on whether wrongdoing is permanent or continuing in nature].)[4]

*Mangini* does not persuade us of plaintiffs' position. The nuisance at issue there was the presence of hazardous waste on the property, placed there by a prior lessee of the property, and the court ruled the plaintiffs should be allowed to amend their complaint to plead facts showing the waste posed a continuing nuisance. (*Mangini, supra,* 230 Cal.App.3d at pp. 1131, 1145–1147.) In so doing, the court explained that the crucial difference between a permanent and a continuing nuisance was whether the nuisance could be discontinued or abated; if this was possible, the nuisance was continuing and thus not subject to the statute of limitations. (*Id.* at pp. 1146–1147.) And the nuisance in *Mangini* could be continuing, although the offending conduct ended years previously, because "the 'continuing' nature of the nuisance refers to the continuing damage caused by the offensive condition, not to the acts causing the offensive condition to occur." (*Id.* at p. 1147, citing *Kafka v. Bozio* (1923) 191 Cal. 746, 751 (*Kafka*) [law does not presume abatable encroachment will be permanently maintained] and *Phillips v. City of Pasadena* (1945) 27 Cal.2d 104, 107–108 (*Phillips*) [if locked gate could be removed at any time, nuisance was continuing in character].)

---

[4] Plaintiffs do not discuss the relationship between this argument, based on a three-year statute of limitations for the right to recover real property (Code Civ. Proc., § 338, subd. (b)), and the contention they also make, that the five-year period for a prescriptive easement is interchangeable with a private party's statute of limitations for a claim to recover real property (Code Civ. Proc., §§ 321, 325, subd. (b); *Bailey v. Citibank, N.A.* (2021) 66 Cal.App.5th 335, 351, fn. 4).

It is true that where, as here, the nuisance is a solid structure, it is often treated as permanent rather than continuing.  (*Baker v. Burbank-Glendale-Pasadena Airport Authority* (1985) 39 Cal.3d 862, 869 (*Baker I*) [examples of permanent nuisance include a building encroaching on land or regrade of a street].)  However, this rule may not apply where it appears the solid structures can be removed, as in the case of a city-installed barrier blocking access to property, or an encroaching structure pushing the plaintiff's building out of alignment.  (*Id.* at p. 870, fn. 11, citing *Phillips*, *supra*, 27 Cal.2d at p. 107 and *Kafka*, *supra*, 191 Cal. at pp. 751–752.)  The fact that a nuisance can be ordered abated itself implies that " 'the nuisance was abatable and therefore of a continuing nature.' " (*Gehr v. Baker Hughes Oil Field Operations, Inc.* (2008) 165 Cal.App.4th 660, 668; see *Wade v. Campbell* (1962) 200 Cal.App.2d 54, 59 ["continuing nuisance is one which may be abated at any time"].)  Moreover, "[i]n case of doubt as to the permanency of the injury," the owner of the land encroached upon "may elect whether to treat a particular nuisance as permanent or continuing."  (*Baker I*, at p. 870.)

The nuisance caused by the unpermitted wall and other improvements in this case can be characterized as a continuing nuisance. The encroachments were built without a permit, and the nuisance thereby created has always been subject to abatement.  Not only *can* this public nuisance be abated, but the County has ordered it *must* be, through a citation directed to Peletta.  The nuisance must be abated either through a retroactive permit, after making changes necessary to bring the improvements into compliance with applicable codes, or by removing the improvements and restoring the hillside to its original condition, which also requires permits.  Maintaining the status quo is not an option.  And Peletta has chosen to characterize the

12

nuisance as a continuing one. In the circumstances, we conclude the general rule that there can be no prescriptive easement to maintain a public nuisance governs this case. (*Strong*, *supra*, 180 Cal. 331, 334; see *Zack's*, *supra*, 165 Cal.App.4th at p. 1183.) The trial court did not err in determining as a matter of law that plaintiffs could not establish a claim to a prescriptive easement, and in barring them from introducing evidence on that point.

The cases upon which plaintiffs rely do not persuade us otherwise. Plaintiffs point to *Hudson v. Dailey* (1909) 156 Cal. 617, 629–630 (*Hudson*), in which our high court concluded the statute of limitations barred a riparian water user from suing her upstream neighbor for drilling wells that diverted her water supply. The statute barred the action even though the defendant's wells were a public nuisance when they allowed the water to run to waste during the winter months. (*Id.* at p. 630.) "We cannot say that a private prescriptive right to private property may not be obtained by means of acts which may also constitute or cause a public nuisance," said the *Hudson* court. (*Ibid.*) But the Court did not explain the circumstances in which that might occur, and it immediately followed this double negative with a dispositive observation about the statute of limitations: When a private property owner specially injured by a public nuisance brings an action, that action "is barred in the same manner as other actions of like nature." (*Ibid.*) The private party "cannot invoke the protection of the public right to abate the nuisance, which is not barred, . . . [to] avoid the effect of the statute of limitations." (*Ibid.*) While we cannot disagree with the *Hudson* court's comment regarding a private prescriptive right, *Hudson* is a statute of limitations case, and its holding is of limited value where the *encroaching* parties have brought an action seeking a prescriptive easement. In the circumstances of this case, we therefore decline to rely on a single sentence

13

that appears to be dicta, to the extent the sentence conflicts with the Court's otherwise consistent theme that no right to maintain a public nuisance may be obtained by prescription.[5]  (See, e.g., *Strong, supra*, 180 Cal. at p. 334.)

Plaintiffs also rely on two cases considering how avigation easements for airport operations that produce noise, vibration, and other inconveniences affected the right to recover damages for nuisance, *Institoris v. City of Los Angeles* (1989) 210 Cal.App.3d 10, 18 (*Institoris*) and *Baker v. Burbank-Glendale-Pasadena Airport Authority* (1990) 220 Cal.App.3d 1602 (*Baker II*).[6] Each of these cases concluded the airport could not be required to compensate the plaintiffs for damages caused by the easement it had acquired. (*Institoris*, at pp. 22–23; *Baker II*, at p. 1610.)  Notably, in neither case did the plaintiffs challenge the *existence* of the easement; rather, they sought damages for harm caused by the nuisance.  (*Institoris*, at p. 18; *Baker II*, at p. 1605.)  And in neither case did the plaintiffs suffer harm different in kind from that suffered by the general public, so as to allow a private party to

---

[5] *Hudson* also provided a second, independent basis for rejecting the plaintiff's argument based on the wells being a public nuisance during the winter.  "[T]he water from these wells did not go to waste during the irrigating season" so the defendant could acquire by adverse use, during these regular periods, rights the water.  (*Hudson, supra*, 156 Cal. at pp. 630–631.)  This alternative holding is not relevant to the case before us, as it is limited to the seasons during which the wells were indisputably *not* a public nuisance.

[6] Federal law "recognize[s] the freedom of air transit through navigable airspace" but requires an avigation easement " 'when the noise, vibration, fumes, fuel particles and inconvenience caused by low-flying aircraft interfere with the use and enjoyment of the underlying property to the extent it amounts to a taking.' "  (*Institoris, supra*, 210 Cal.App.3d at p. 18.)  The airport authorities in *Institoris* and *Baker II* acquired their avigation easements by prescription or, equivalently, adverse possession.  (*Baker II, supra*, 220 Cal.App.3d at p. 1610; *Institoris*, at p. 22.)

14

recover for harm based on a public nuisance. (*Institoris*, at p. 21; *Baker II*, at p. 1610; Civ. Code, § 3493.) Neither of these cases changes our conclusion that the record before the court at the time of its ruling showed, as a matter of law, that plaintiffs did not acquire a prescriptive right to maintain the improvements they constructed on Peletta's property without the necessary permits, creating a public nuisance that was subject to abatement.

Plaintiffs argue also that the public interest favors granting a prescriptive easement because the wall protects against fire danger and erosion. But they provide no authority suggesting that this is an element of a prescriptive easement, or that it somehow negates the principle that the right to maintain a public nuisance cannot be acquired by prescription. We will not overturn the trial court's decision on this ground.

## II.    Equitable Easement

Plaintiffs contend the evidence compels a conclusion that they satisfied the elements of an equitable easement to the disputed property.

A trial court has discretion to grant an equitable easement if the person seeking the easement shows three things: the trespass was " ' "innocent" ' " rather than ' "willful or negligent" ' "; the easement will not cause irreparable injury to the public or the property owner; and the hardship to the trespasser from denying the easement is " ' " 'greatly disproportionate' " ' " to the property owner's from continuance of the easement. (*Shoen v. Zacarias* (2015) 237 Cal.App.4th 16, 19 (*Shoen*).) The court may not grant the easement unless all three of these prerequisites are established. (*Ibid*.; *Hansen v. Sandridge Partners, L.P.* (2018) 22 Cal.App.5th 1020, 1028 (*Hansen*).) Of the three elements, the requirement that the encroachment be "innocen[t]" rather than willful or negligent, is the most important. (*Hansen*, at pp. 1028–1029.) Courts " 'approach the issuance of easements with "[a]n

15

abundance of caution" ' " and resolve doubtful cases against the easement. (*Nellie Gail Ranch Owners Assn. v. McMullin* (2016) 4 Cal.App.5th 982, 1004 (*Nellie Gail*); see *Linthicum v. Butterfield* (2009) 175 Cal.App.4th 259, 265 (*Linthicum*); *Hirshfield v. Schwartz* (2001) 91 Cal.App.4th 749, 759 (*Hirshfield*).)

We review the trial court's factual findings for substantial evidence (*Hansen*, *supra*, 22 Cal.App.5th at p. 1028) and its decision whether to grant the easement—including its determination of whether the encroacher's " 'conduct is so egregious as to be willful or whether the quantum of the [encroacher's] negligence is so great as to' " defeat an easement—for abuse of discretion. (*Nellie Gail*, *supra*, 4 Cal.App.5th at p. 1004; see *Shoen*, *supra*, 237 Cal.App.4th at p. 20.) In deciding whether there was an abuse of discretion, "we resolve all evidentiary conflicts in favor of the judgment and determine whether the court's decision ' "falls within the permissible range of options set by the legal criteria." ' " (*Hirshfield*, *supra*, 91 Cal.App.4th at p. 771.)

The trial court concluded that plaintiffs had established none of the three elements of an equitable easement. We need discuss only the first, as we conclude it is sufficient to support denial of an equitable easement.

Plaintiffs argue their encroachment on Peletta's property was innocent because they, like Peletta's predecessor, reasonably believed the barbed-wire fence marked the boundary of the two properties, and the wall was built on their side of the fence. For this point, they draw our attention to cases upholding equitable easements where the encroaching parties believed they had a right to the property. (*Hinrichs v. Melton* (2017) 11 Cal.App.5th 516, 519, 523 [no abuse of discretion in granting equitable relief where landlocked landowner believed he had right of way over trail]; *Tashakori v. Lakis* (2011)

16

196 Cal.App.4th 1003, 1007–1010 [prepurchase representations by real estate broker, prior owner, and legal description in title report indicated easement to public road existed]; *Hirshfield*, *supra*, 91 Cal.App.4th at pp. 755, 772 [parties assumed chain link fence marked property line].) But the question before us is not whether the trial court could properly have *granted* an equitable easement, but whether it acted within the scope of its discretion in *denying* it, an inquiry in which we presume the judgment is correct and resolve all ambiguities in favor of affirmance. (*Hirshfield*, at pp. 765–766.)

In considering whether the encroachment was innocent, the trial court found that plaintiffs thought they were building on their own property and that, "like many property owners, [they] would have relied on their contractor or engineers to pull permits." But these factors were not the basis for the court's conclusion that the encroachment was not innocent. Rather, the trial court went on to explain that it had a "difficult time believing that Plaintiffs, both highly intelligent and apparently successful attorneys, did not know that they needed permits to construct the Wall." The court had visited the site, and noted that the retaining wall and associated road and parking area were "significant improvements," the wall reaching as high as 17 feet in the encroaching area and travelling around most of plaintiffs' property. Building the wall would have been a "massive, lengthy, and expensive construction project" involving heavy equipment. And plaintiffs "should have known that permits might be required," particularly in light of evidence that in 1988 they knew they needed—and in fact obtained—a permit for a driveway gate, and by April 1998 they knew they needed after-the-fact permits for interior retaining walls built on their property. The court also noted that, as a result of the unpermitted construction, the wall was built not only on Peletta's property but also without stormwater and erosion control plans that would

17

have prevented water erosion on Peletta's property, which will now have to be remediated if the retaining wall is to remain in place.

We recognize that there is authority suggesting mere negligence is not necessarily a bar to an equitable easement. (*Linthicum*, *supra*, 175 Cal.App.4th at p. 266; but see *Hansen*, *supra*, 22 Cal.App.5th at p. 1028, fn. 10 [disagreeing with *Linthicum* to extent it suggested party could be entitled to equitable easement if encroachment was negligent].) So did the trial court, as its ruling shows, and it concluded the evidence showed more. In the circumstances before us, we conclude both that there is substantial evidence to support the trial court's factual findings and that there was no abuse of discretion in its conclusion that the encroachment was not innocent.

Because plaintiffs have not shown they satisfied the first element of an equitable easement, we need not address their contentions that the other two elements were met. (See *Hansen*, *supra*, 22 Cal.App.5th at p. 1030, fn. 12.)

## III. Exclusion of Evidence of Allegedly Defamatory Statements

### A. The Disputed Communications and the Trial Court's Ruling

Plaintiffs contend the trial court erred in granting Peletta's motion before the Phase 2 trial to exclude evidence of statements he made to governmental agencies. The communications in question were found in an e-mail dated March 24, 2019 from Peletta to two County employees, an e-mail Peletta then forwarded to a neighbor, Al Czap. The subject line on the e-mail is "460/440 Stonecrest Demand Letters."

We quote the text of Peletta's e-mail in full (without conforming grammar and punctuation): "Thank you both for discussing the code violations caused by Wang. As you know in August 2018 the County became aware of the significance of the code violations caused by Wang as a result of my property survey. The Wang's have knowingly, consciously been engaged

18

in: [¶] unlawful construction, [¶] encroached on my land and [another neighbor's], [¶] cause damage to the environment, [¶] avoid payroll taxes, worker's compensation, permit fees, [¶] clearly a case of gross negligence for admittedly 30 years. I believe you understand the dependencies and constraints I have with respect to correction action of the code violations I've been cited for. I had nothing to do with these codes violation Wang created them.

"The law firm of Wang and Wang is a global powerhouse with offices throughout the world and a significant amount of resources. I do not have the financial resources that Wang has. As you have witnessed they have aggressively pursued litigation when I built my fence to protect me from potential liability and risks. I believe the County will get a similar response. Wang does not have any ethics or scruples, they lie under oath in their declarations, cheat the government out of taxes, private citizens out of land and property rights, promote the underground economy and simply cannot be trusted. They are privileged and operate above the law with willful disregard of the law and common good. They are a disgrace to their profession and I can't believe UC Berkeley and other institutions would choose to have any association with Wang and Wang when they learn about their life of hypocrisy.

"Based on [a neighbor's] and Peletta cases to date, the probability of lengthy and costly litigation might be expected. Wang and Wang have had almost a year to prepare for this battle.

"Know you have our full cooperation. We would appreciate a copy of the demand letter when it becomes public record. While I do not expect special treatment, I do appreciate the County's consideration of my circumstances."

19

Plaintiffs also draw our attention to other communications in which Peletta referred to the wall as the "GWOW," by which he apparently meant "Great Wall of Wang," and to an e-mail to Czap in which Peletta referred to plaintiffs' gardener as "el heffy." These terms, plaintiffs argue, were racially charged and, although Peletta did not use them in the allegedly defamatory e-mail, they are evidence that Peletta acted maliciously when he made the allegedly defamatory statements in the March 24, 2019 e-mail. Plaintiffs also point to evidence that Peletta intimidated plaintiffs' employees, and that Peletta's statement that plaintiffs did not pay payroll taxes or workers' compensation premiums was false.

The trial court granted Peletta's motion in limine excluding all this evidence. The court found that most of the statements in the March 24, 2019 e-mail were protected by section 47 of the Civil Code (section 47) and that the privilege was unaffected by the fact that Peletta forwarded the e-mail to the neighbor, Czap. As to Peletta's statements that plaintiffs were a "disgrace to their profession" and that he could not believe the University of California, Berkeley (UC Berkeley) would associate with plaintiffs, the court concluded that though these statements were not protected by section 47, they were nonactionable opinions.

### B. Legal Standards

Section 47 generally protects statements made in a legislative or judicial proceeding or "in any other official proceeding authorized by law." (§ 47, subd. (b).) An official proceeding, for these purposes, " ' "has been interpreted to encompass those proceedings which resemble judicial and legislative proceedings, such as transactions of administrative boards and quasi-judicial and quasi-legislative proceedings." ' " (*Picton v. Anderson Union High School Dist.* (1996) 50 Cal.App.4th 726, 737 (*Picton*).) Plaintiffs

20

do not dispute that the County's actions regarding the unpermitted improvements and code violations constituted an official proceeding.

Where the privilege of section 47 applies, it is absolute and is not affected by the presence of malice. (*Ascherman v. Natanson* (1972) 23 Cal.App.3d 861, 864–865 (*Ascherman*).) A privileged statement "need not be relevant, pertinent or material to any issue before the tribunal; *it need only have some connection or some relation*" to the proceeding. (*Id*. at p. 865.) The purpose of this rule is to " ' "assure [the] utmost freedom of communication between citizens and public authorities whose responsibility is to investigate and remedy wrongdoing." ' " (*Picton, supra*, 50 Cal.App.4th at p. 737.)

This rule notwithstanding, "[e]ven when a document broadly relates to [an official proceeding], it may contain unrelated parts that do not find shelter in the privilege." (*Dziubla v. Piazza* (2020) 59 Cal.App.5th 140, 156 (*Dziubla*).) A statement made in an official proceeding is not privileged unless it has " 'some reasonable relevancy to the subject matter of the action,' " and it is unprivileged if it is " 'extraneous to the action.' " (*Nguyen v. Proton Technology Corp.* (1999) 69 Cal.App.4th 140, 147 (*Nguyen*), quoting *Silberg v. Anderson* (1990) 50 Cal.3d 205, 219–220 (*Silberg*).)

The parties disagree on the standard of review we should apply. Peletta suggests we should uphold the trial court's ruling because there is substantial evidence to support it, but he is mistaken as to our standard of review for two reasons. First, as we have explained, where a ruling on a motion in limine effectively acts as a motion for nonsuit, on review we must view all inferences and conflicts in the evidence most favorably to the nonmoving party and uphold the ruling "only if it was required as a matter of law." (*Edwards, supra*, 53 Cal.App.4th at p. 28; accord, *Amtower, supra*, 158 Cal.App.4th at p. 1595.) Here, the only communication that formed the basis

21

of the cause of action for defamation was the e-mail we have described, so the effect of the trial court's ruling was to dispose of that claim. Moreover, the general rules applicable to section 47 militate in favor of independent review. At least to the extent the facts are undisputed, the question of whether a given statement is within the privilege is one of law, not of fact. (*Nguyen*, *supra*, 69 Cal.App.4th at p. 147; *Rothman v. Jackson* (1996) 49 Cal.App.4th 1134, 1139–1140 (*Rothman*) ["interpretation of section 47, subdivision (b) is a pure question of law which we review independently"].) We shall apply this standard of review here.

## C. Analysis

With these standards in mind, we consider whether the statements in question could form the basis of a cause of action for defamation. *Dziubla* is instructive. The defendant there, who owned a business and who was involved in litigation with the plaintiffs, published an "Alert" characterizing one of the plaintiffs as an enemy of the defendant's business, describing him as a " 'Lying, Two-Faced, Gun-Grabbing Hillary Clinton Supporting, Con Man' who was 'attempting to STEAL [the business].' " (*Dziubla*, *supra*, 59 Cal.App.5th at p. 146.) The Alert used "forceful—even violent—rhetoric and appealed for monetary contributions to [the defendant's] 'litigation war chest.' " (*Ibid*.) It also "doxed" the plaintiffs by publishing their home address, pictures of their house, and pictures of one of their faces. (*Ibid*.)

The appellate court concluded that all of the statements in the Alert *except* the doxing were protected by section 47. The Alert informed recipients about the litigation the parties were involved in and asked for their help in funding it. Thus, the Alert was "written and distributed to achieve the ends of [the defendant's] petition for judicial relief," and these statements were protected. (*Dziubla*, *supra*, 59 Cal.App.5th at pp. 155-156.) The doxing,

22

however, was not protected as there was "no good reason to include [the plaintiff's] home address, images of his house and a closeup picture of his face in a communication aimed at explaining the status of ongoing litigation and soliciting financial support"; rather, the information merely helped would-be harassers find their target. (*Id.* at p. 156.)

The court in *Dziubla* relied in part on *Nguyen*, which considered a letter from a business to a competitor threatening litigation for improper solicitation of employees. (*Dziubla*, *supra*, 59 Cal.App.5th at pp. 156–157, citing *Nguyen*, *supra*, 69 Cal.App.4th at pp. 143–144.) The letter informed the competitor, inaccurately, that one of the employees had been working under a furlough program sponsored by the County's probation department and had been " 'in prison for repeatedly and violently assaulting his wife.' " (*Nguyen*, at pp. 143–145.) The court in *Nguyen* concluded the litigation privilege did not apply to these statements because the employee's conviction history was unrelated to the threatened litigation. (*Id.* at pp. 151–152.)

In our view, Peletta's statements in the March 24, 2019 e-mail largely, or entirely, fall within the privilege of section 47. By its terms, Peletta's e-mail addressed questions related to the County's proceedings in connection with the code violations on his property, for which he had been issued a citation. His recitation of plaintiffs' alleged acts of wrongdoing—of failure to abide by the law—was expressly made in the context of seeking the County's understanding of the difficulty he faced in remediating those violations, his lack of responsibility for creating them, and plaintiffs' lack of credibility in the dispute, as the County considered its response. However intemperate or unfounded some of his statements may have been, they were related to the County's investigation.

23

Plaintiffs point to Peletta's statements that they avoided payroll taxes and workers' compensation (or "cheat the government out of taxes" and "promote the underground economy") and argue that these were unrelated to the official proceeding regarding the code violations. But the e-mail shows that these statements were bound up in Peletta's effort to place blame for any violations of the law that took place on his property on the shoulders of plaintiffs, rather than on his own, and we agree with the trial court that they fall within section 47's scope.

Our conclusion is not affected by plaintiffs' argument that some of Peletta's comments in other communications, for instance referring to the wall as the "GWOW" and plaintiffs' gardener as "el heffy," were racist or xenophobic and show malice. However offensive such childish name calling might be, malice does not defeat a claim of privilege under section 47. (*Ascherman*, *supra*, 23 Cal.App.3d at pp. 864–865.)

We also agree with the trial court that, to the extent that section 47 does not reach the statements that plaintiffs were "a disgrace to their profession" and that Peletta "can't believe UC Berkeley and other institutions would choose to have any association with [them] when they learn about their life of hypocrisy," these statements do not support a cause of action for defamation for a different reason. A statement is not defamatory unless it contains a " ' "provable falsehood" ' " rather than a mere expression of opinion. (*Bently Reserve LP v. Papaliolios* (2013) 218 Cal.App.4th 418, 426.) True, an expression of opinion does not have "blanket protection" and may constitute actionable defamation if it "implies a false assertion of fact." (*Summit Bank v. Rogers* (2012) 206 Cal.App.4th 669, 696.) But, to the extent these statements imply facts about plaintiffs' behavior, we have already concluded those factual assertions are protected by section 47. To the extent

the statements say or suggest that plaintiffs' behavior is disgraceful and would displease those in positions of authority at UC Berkeley or elsewhere, we have no trouble concluding they are an expression of Peletta's own opinion on the import of that behavior.

These conclusions are unaffected by Peletta's action in forwarding the March 24, 2019 e-mail to Czap. It is true that section 47 generally does not protect "republications to nonparticipants in [an] action." (*Silberg*, *supra*, 50 Cal.3d at p. 219.) Thus, the privilege does not apply to publications to persons unconnected with the proceedings, or to publications to the general public. (*Abuemeira v. Stephens* (2016) 246 Cal.App.4th 1291, 1299; *GetFugu, Inc. v. Patton Boggs LLP* (2013) 220 Cal.App.4th 141, 153.) This limitation applies to nonparties "who lack a substantial interest" in the proceeding. (*Argentieri v. Zuckerberg* (2017) 8 Cal.App.5th 768, 784; *Susan A. v. County of Sonoma* (1991) 2 Cal.App.4th 88, 94.) But a communication that functions as a useful step in the proceeding and serves the purposes of the privilege falls within it. (*Rothman*, *supra*, 49 Cal.App.4th at p. 1146.)

Among the exhibits Peletta submitted in support of his motion to exclude evidence of statements made to governmental agencies was a July 24, 2018 e-mail from an employee of the County, Neil Vopham to two recipients, one of whom was another County employee, Gregory Baxter, and the other of whom was Czap. The e-mail included a prior chain of communications: In one of them, Vopham told Baxter that Czap lived up the hill from 460 Stonecrest Drive and had allowed the County access to the surrounding properties; in another, Czap sought information on when a County engineer would look at plaintiffs' property and offered to coordinate the County's review; in yet another, to a neighbor, Peletta indicated Czap was interested in buying "the 10 acres" and discussed "the complexity" in light of plaintiffs'

25

encroachments.  Another exhibit was a July 24, 2018 e-mail from Czap to Baxter, Peletta, and two other neighbors, in which Czap attached a survey and offered to "run[] point" in communications with Wang; other e-mails in the chain included one from Baxter to Czap, Peletta, and the other neighbors thanking them for an update, and one indicating the County was about to issue citations for the unpermitted improvements.  At the hearing on the motion in limine, plaintiffs' counsel stated he did not object to the court considering these exhibits, and the court expressly did so.

These e-mails leave no doubt that Czap was substantially connected to the proceedings as the County considered the unpermitted improvements.  In their opening brief, plaintiffs make a bare assertion that Peletta had no governmental purpose in forwarding his e-mail to Czap, and in their reply brief plaintiffs argue that Czap's connection to the action was one for the trier of fact, not for the court.  But they fail to address the clear showing, based on communications plaintiffs agreed the trial court could consider, that Czap was intimately involved in the dispute between the neighbors and in the County's proceedings regarding the code violations.  We agree with the trial court that republication to Czap could not defeat the privilege of section 47.

**DISPOSITION**

The judgment is affirmed.


TUCHER, P. J.


WE CONCUR:

PETROU, J.
RODRÍGUEZ, J.


*Wang et al. v. Peletta* (A169968)


26

Trial Court:          Napa County Superior Court

Trial Judge:          Hon. Cynthia Pillsbury Smith

Counsel:              Reed Smith, Raymond A. Cardozo; and Skaggs Faucette,
                      Jason M. Skaggs for Plaintiffs, Cross-defendants and
                      Appellants

                      Steyer Lowenthal Boodrookas, Jeffrey H. Lowenthal,
                      Edward Egan Smith; Clark Hill, Timothy M. Flaherty
                      and David M. Perl for Defendant, Cross-complainant,
                      and Respondent