Filed 7/31/25  Roe v. Cordoba CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| JOHN ROE,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>MADELINE CORDOBA, et al.,<br><br>Defendants and Respondents. | B329885<br><br>(Los Angeles County Super. Ct. No. 22STCV32918) |

APPEAL from order and judgment of the Superior Court of Los Angeles County, Terry A. Green, Judge.  Affirmed.

Gusdorff Law and Janet Gusdorff for Plaintiff and Appellant.

Ford, Walker, Haggerty & Behar, Neil Tardiff and William Haggerty, for Defendants and Respondents Justin Daily, Reed Aljian, and Daily Aljian LLP.

Defendant and cross-complainant Madeline Cordoba tested positive for a sexually transmitted disease (STD) after having unprotected sex with plaintiff and cross-defendant John Roe. She retained attorneys, respondents and defendants Daily Aljian LLP, Reed Aljian, and Justin Daily (the Attorneys), to pursue claims against Roe, and they sent him a letter that described her claims and inquired about his interest in resolving the dispute. Shortly thereafter, Roe sued both Cordoba and the Attorneys. He alleged the letter constituted extortion and libel per se.

The Attorneys filed a special motion to strike the causes of action against them pursuant to Code of Civil Procedure, section 425.16[1] (the anti-SLAPP motion). The trial court granted the motion and entered judgment for the Attorneys. Thereafter, the Attorneys successfully moved for their attorney fees and costs. Roe contends the anti-SLAPP motion was granted in error and that the fee award was excessive. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

#### A.   Roe's Operative First Amended Complaint

On October 7, 2022, Roe filed the underlying action in propia persona against Cordoba and the Attorneys. The following week, he filed the operative first amended complaint. We summarize the relevant allegations here.

Though Roe had a girlfriend, he began a sexual relationship with Cordoba in September 2021. Cordoba asked Roe about testing for STDs. Roe told her "he had taken a panel of STD tests in February 2022 and was informed by the clinic that his panel of test results was clean." They had unprotected sex.

---

[1]     Undesignated statutory references in this opinion are to the Code of Civil Procedure.

2

Additional unprotected sexual encounters took place during a subsequent trip to New York City.

Following that trip, Cordoba complained of genital pain, and some weeks later, informed Roe that she had tested positive for herpes. Roe ended their relationship. Cordoba informed Roe's girlfriend that she had developed a symptom of an STD after having sex with Roe over a period of months. Cordoba also informed others that Roe exposed her to herpes, and she threatened to "go to his law firm and attempt to expose him." Roe was "shunned" by Cordoba's "friends and network."

Roe asserted claims against Cordoba for libel per se, slander per se, intentional infliction of emotional distress (IIED), and fraudulent concealment. Relevant to this appeal, Roe also asserted claims against the Attorneys for civil extortion and libel per se, both arising from a September 21, 2022 letter signed by Aljian.

It was undisputed that Aljian sent the letter to Roe at his work address, the Chicago office of a law firm, by first class certified mail. Aljian wrote that Cordoba retained the Attorneys to pursue claims against Roe for sexual assault, sexual battery, fraudulent misrepresentation, fraudulent concealment, and IIED. He wrote, "[B]efore filing a lawsuit, we wish to inquire with you whether you would be interested in attempting to resolve these claims informally." Cordoba, he wrote, consented to having unprotected sex with Roe in reliance on his representations that he had recently tested negative for STDs and "had not had any unprotected incidents." He provided the dates, times, and substance of the relevant conversations and encounters. Aljian stated that Roe's infecting Cordoba was "medically undeniable" based on her test results, and in litigation, he would obtain

3

"[Roe's] entire medical history" and prove that Roe knew he had herpes or knew he had not tested negative for herpes. The letter concluded with a demand to preserve evidence.

In his complaint, Roe alleged that the letter was "designed to extort money" from him by "expressly alleging criminal liability" against him and his close associates. The Attorneys sent the letter to Roe's workplace to "scare" him and increase their settlement leverage. Roe's libel per se claim focused on the list of claims against him and the statement that Roe "'medically undeniably' infected [Cordoba] with Herpes." According to Roe, the letter was written with knowing or reckless disregard for the "reality" that Cordoba could have contracted herpes from others. It was crafted so that Roe's coworkers would see it, and one actually saw it.

## B.     The Attorneys' Anti-SLAPP Motion

In mid-December 2022, Attorneys filed their anti-SLAPP motion. Cordoba filed an answer to the first amended complaint and a cross-complaint asserting causes of action for sexual battery, gender violence, intentional misrepresentation, concealment, negligent misrepresentation, negligence, and IIED.

Roe filed an opposition brief. Roe's primary argument was that the letter was extortionate and therefore not protected by the anti-SLAPP law pursuant to *Flatley v. Mauro* (2006) 39 Cal.4th 299 (*Flatley*). He also filed a document titled "Plaintiff's Declaration in Support of Opposition to Special Motion to Strike Filed Pursuant to California Code of Civil Procedure § 425.16" that attached various exhibits. This document was not signed under penalty of perjury.

4

The Attorneys filed evidentiary objections along with their reply. At the February 8, 2023 hearing, the trial court sustained many of these objections, including their objection to the entirety of Roe's declaration on the basis that he did not sign it under penalty of perjury.[2]

The trial court granted the anti-SLAPP motion and struck the causes of action against the Attorneys, finding the letter was not extortionate as a matter of law. "The substance of this letter is relatively plain vanilla, as demand letters go," the court wrote, and Roe failed to submit evidence that was "conclusive proof of extortion." As for Roe's probability of prevailing, the court found that the litigation privilege provided a complete defense. The letter on its face "clearly relate[d] to the pending cross-complaint" and indicated the Attorneys' good faith contemplation and serious consideration of legal action. Roe had "no evidence that the [Attorneys] intended the letter for any eyes other than his," nor evidence that "the [Attorneys] knew or should have known, at the time they sent the letter, that they had a bad case."

Judgment was entered for the Attorneys, and they moved for attorney fees and costs pursuant to section 425.16, subdivision (c)(1). The Attorneys requested $80,775 in attorney fees and $3,141.61 in costs. The trial court awarded fees of $56,173 and costs of $2,857.61. Subsequently, the trial court granted the Attorneys' motion to amend the judgment and entered an amended judgment. Roe appealed from the order granting the anti-SLAPP motion and from the amended judgment.

---

[2]     Roe does not challenge any of the evidentiary rulings on appeal.

## DISCUSSION

## A.      Section 425.16 and Standard of Review

The Legislature enacted section 425.16 to prevent and deter "lawsuits [referred to as SLAPPs] brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances."  (§ 425.16, subd. (a).)  Section 425.16 provides:  "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech . . .  shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."  (§ 425.16, subd. (b)(1).)  An "'act in furtherance of a person's right of petition or free speech . . . in connection with a public issue'" is defined to include written statements made "before a . . . judicial proceeding" or "in connection with an issue under consideration or review" by a "judicial body" and other conduct "in furtherance of the exercise of the constitutional right of petition."  (§ 425.16, subd. (e)(1), (2), (4).)

We use a two-prong test to evaluate a motion to strike a cause of action under the anti-SLAPP law:  "(1) has the moving party 'made a threshold showing that the challenged cause of action arises from protected activity' [citation]; and, if it has, (2) has the nonmoving party demonstrated that the challenged cause of action has "'minimal merit'" by making 'a prima facie factual showing sufficient to sustain' a judgment in its favor?"  (*Geragos v. Abelyan* (2023) 88 Cal.App.5th 1005, 1021–1022 (*Geragos*), citations omitted.)  After the first prong is satisfied, the burden then shifts to the nonmoving party to demonstrate that each challenged claim based on protected activity is legally

6

sufficient and factually substantiated. (*Id.* at p. 1022.) An order granting an anti-SLAPP is reviewed de novo. (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788.)

Roe challenges the trial court's findings regarding both prongs of the anti-SLAPP analysis.

## B.     Prong One:  Claims Arising From Protected Activity

### 1.     *The Letter Is a Protected Prelitigation Communication*

"'A claim arises from protected activity when that activity underlies or forms the basis for the claim.' [Citation.]" (*Geragos, supra,* 88 Cal.App.5th at p. 1023; § 425.16, subd. (b)(1).) "Ordinarily, a demand letter sent in anticipation of litigation is a legitimate speech or petitioning activity that is protected under section 425.16." (*Malin v. Singer* (2013) 217 Cal.App.4th 1283, 1293 (*Malin*).)

The settlement letter was the only basis of Roe's claims against the Attorneys. It stated that the Attorneys were retained to pursue claims arising from Cordoba's contracting an STD from Roe, described the supporting facts and legal theories, asked about Roe's interest in settling, and demanded that he preserve relevant evidence. Aljian explained in his declaration that he often contacts defendants before filing a lawsuit to discuss potential settlement. What he sent to Roe was a "standard pre-litigation settlement letter," and Aljian intended to file a lawsuit if the parties did not settle. The Attorneys actually filed the cross-complaint 12 weeks later, indicating they were sincere about pursuing litigation.

Despite the clear connection between the letter and the cross-complaint, Roe argues that the letter was not protected

7

under the anti-SLAPP law because the Attorneys could not have believed in good faith that Cordoba possessed a legally viable claim when they sent it.  He argues that Cordoba's medical records show that she initially tested negative for herpes after her last sexual contact with Roe and that his records showed he tested negative for herpes.

Roe relies on *Bailey v. Brewer* (2011) 197 Cal.App.4th 781, 790 (*Bailey*) to support this argument.  In *Bailey*, this division stated that "a party seeking to invoke the protections of section 425.16 for prelitigation statements must demonstrate that the statements 'relate[ ] to litigation that is contemplated in good faith and under serious consideration.' [Citation.]" (*Id.* at p. 792.)  Generally, a "party need not demonstrate that it would succeed on the merits of the contemplated litigation in order to invoke the protection of . . . section 425.16." (*Id.* at p. 793.)  However, it is a different situation when the prelitigation statements concern litigation that cannot be pursued as a matter of law.  *Bailey* described a "narrow" rule that "applies only in cases where the proponent of the contemplated litigation has been barred from relitigating the contemplated claims under the doctrine of res judicata.  In such circumstances, no reasonable plaintiff could have believed in good faith that the contemplated litigation was legally viable." (*Id.* at p. 795.)

Here, Roe does not contend that res judicata bars Cordoba's claims, so *Bailey* does not preclude us from concluding that the settlement letter related to litigation was contemplated in good faith and under serious consideration.

2.     Flatley *Does Not Preclude a Finding That the Letter Is Protected by the Anti-SLAPP Statute*

Roe also argues that because the settlement letter and other verbal and written threats were extortionate as a matter of law, they are not protected by the anti-SLAPP law, citing *Flatley, supra,* 39 Cal.4th 299.

As a preliminary matter, Roe cannot establish extortion based on conversations and other communications that may have occurred after he received the settlement letter. "'[T]he issues in an anti-SLAPP motion are framed by the pleadings.' [Citation.]" (*Medical Marijuana, Inc. v. ProjectCBD.com* (2020) 46 Cal.App.5th 869, 883.) "Thus, the act or acts underlying a claim for purposes of an anti-SLAPP statute [are] *determined from the plaintiffs' allegations*." (*Ibid.*) "[W]e will not 'insert into a pleading claims for relief based on *allegations of activities that plaintiffs simply have not identified. . . .*' [Citation.]" (*Ibid.*) Because both of Roe's causes of action against the Attorneys arise from the settlement letter alone, we focus on the letter.

a.     *Flatley*

In *Flatley*, an attorney, Mauro, sent Flatley, a well-known dancer, a letter accusing him of raping Mauro's client, Robertson. (39 Cal.4th at p. 308.) Mauro indicated that a police report had been filed concerning the incident and went on to accuse Flatley of unspecified "criminal offenses involving immigration and tax law as well as violations of the Social Security Act." (*Id.* at pp. 309, 330.) These matters, Mauro wrote, would be publicly exposed "unless [Flatley] 'settled' by paying a sum of money to Robertson of which Mauro would receive 40 percent." (*Id.* at p. 329.) In a call with Flatley's lawyer, Mauro demanded at least

9

"seven figures." (*Id.* at pp. 311, 329.) Flatley sued Mauro for civil extortion. In response, Mauro filed an anti-SLAPP motion, arguing that the letter was "a prelitigation settlement offer in furtherance of his constitutional right of petition." (*Id.* at p. 311.)

Our high court found Mauro's communications to be extortive as a matter of law, and thus, they were not free speech protected by the Constitution and the anti-SLAPP statute. (*Flatley,* at p. 328.) The communications threatened to "accuse" Flatley of, or "impute to him," "crime[s]" and "disgrace" (Pen. Code, § 519, subds. 2, 3) unless Flatley paid Mauro. The court's conclusion rested on several aspects of Mauro's conduct. He (1) made accusations of a crime that would be exposed directly to the worldwide media (*id.* at p. 330); (2) threatened to expose bad acts unrelated to his client's injuries (*id.* at pp. 330–331); (3) presented a police report that evidence indicated was a sham (*id.* at pp. 331–332); (4) indicated that claims related to the rape were "'just the beginning'" (*id.* at p. 332); and (5) showed disinterest in negotiating and discussing the particulars of his client's claim (*id.* at p. 332).

The *Flatley* court emphasized that its conclusion was "based on the specific and extreme circumstances of this case." (*Flatley,* at p. 332, fn. 16.) It cautioned that "rude, aggressive, or even belligerent prelitigation negotiations, whether verbal or written, that may include threats to file a lawsuit, report criminal behavior to authorities or publicize allegations of wrongdoing," were not extortion per se. (*Ibid.*) Rather, petitioning activity can be criminal extortion as a matter of law for purposes of the *Flatley* exception only in the "narrow circumstance" where "the defendant concedes the illegality of

10

[his] conduct or the illegality is conclusively shown by the evidence . . . ." (*Id*. at p. 316.)

### b. Application of *Flatley*

The Attorneys do not concede they engaged in extortionate conduct. Thus, "the applicability of the *Flatley* exception hinges on whether [Roe] provided uncontroverted evidence conclusively showing [they] committed extortion as a matter of law." (*Geragos, supra*, 88 Cal.App.5th at p. 1025.) He did not.

Roe argues that the Attorneys engaged in extortion because they "threatened to bring suit against [Roe] in his real name that he had [a] sexually transmitted disease, he transmitted a sexually transmitted disease, that he sexually assaulted Defendant, and that they would uncover a criminal conspiracy." To be sure, the letter stated that Roe infected Cordoba with an STD, but this could not be avoided in discussing the merits of a claim for transmitting an STD under false pretenses. Aljian provided the facts that would be alleged in support of the anticipated claims, and he used noninflammatory terms to do so. There was no discussion of suing Roe in his true name or a criminal conspiracy.

The settlement letter lacks other features that persuaded the *Flatley* court to find extortion as a matter of law. There were no threats to publicly expose Roe's conduct; instead, Aljian "strongly advise[d]" him not to discuss it with anyone other than counsel. The letter did not suggest allegations of other bad acts were forthcoming or that they would be reported to the authorities unless payment was made.[3] The stated consequence

---

[3]     This also distinguishes the Attorneys' letter from the demand letter in another case cited by Roe, *Mendoza v. Hamzeh* (2013) 215

11

of failing to settle was that counsel would "proceed accordingly"—that is, "filing a lawsuit." This is typical of language attorneys use in prelitigation demand letters.

We conclude the statements in the letter do not constitute extortion as a matter of law. The statements in it were "reasonabl[y] connect[ed]" to the causes of action Cordoba alleged in her cross-complaint soon thereafter, and hence, were protected under section 425.16. (See *Flickinger v. Finwall* (2022) 85 Cal.App.5th 822, 836 (*Flickinger*); *Malin, supra*, 217 Cal.App.4th at pp. 1299–1300.) The Attorneys made the threshold showing that Roe's causes of action against them are based on protected activity and thus subject to the anti-SLAPP statute.

## C.    **Prong Two:  Minimal Merit**

The trial court found that the litigation privilege barred Roe's claims against the Attorneys. Roe challenges this finding.

"The principal purpose of the litigation privilege is to afford litigants and witnesses the utmost freedom of access to the courts without fear of harassment in subsequent derivative actions." (*Geragos, supra*, 88 Cal.App.5th at p. 1031.) "'The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical

---

Cal.App.4th 799, 806. In *Mendoza*, an attorney threatened to report unidentified crimes allegedly committed by the plaintiff to the California Attorney General, the Los Angeles District Attorney, the Internal Revenue Service, and the Better Business Bureau, "and to disclose the alleged wrongdoing to [plaintiff's] customers and vendors if [plaintiff] did not pay 'damages exceeding $75,000'." (*Ibid.*)

12

relation to the action.' [Citation.]" (*Ibid.*) Prelitigation communication is protected by the privilege, provided that the communication "relates to litigation that is contemplated in good faith and under serious consideration." (*Geragos, supra*, 88 Cal.App.5th at p. 1032.) The privilege is absolute and bars all tort causes of action except malicious prosecution. (*Id.* at p. 1031.) It has been applied in cases involving fraudulent communication, and it "protects even communication made with an intent to harm, so long as the communication is made in 'relation' to a pending/ongoing or genuinely contemplated judicial or other official proceeding." (*Id.* at pp. 1031–1032, citing Civ. Code, § 47, subd. (b).)

The settlement letter described Cordoba's claims, demanded that Roe preserve relevant evidence, and inquired about Roe's interest in settling. Claims it asserted were alleged in a cross-complaint filed not long after. It thus had a logical relation to Cordoba's imminent, contemplated litigation and was protected by the litigation privilege. (See *Malin, supra*, 217 Cal.App.4th at p. 1301 [litigation privilege applied to demand letter "given the similarity of the sexual misconduct allegations in both the letter and subsequent complaint."]; *Flickinger, supra*, 85 Cal.App.5th at p. 840.)

Roe fails to show that the litigation privilege does not apply. He first argues that the letter contained false statements about his health and conduct and third parties read it. However, any falsity is irrelevant because "'communications made in connection with litigation do not necessarily fall outside the privilege merely because they are, or are alleged to be, fraudulent, perjurious, unethical, or even illegal' assuming they are logically related to litigation." (*Blanchard v. DIRECTV, Inc.*

13

(2004) 123 Cal.App.4th 903, 921, citation omitted.) Further, Roe failed to present admissible evidence to establish that the statements are false or that any third party read the letter. His unsworn declaration and unauthenticated exhibits were excluded. (*See Safieddine v. MBC FZ, LLC* (2024) 103 Cal.App.5th 1086, 1094, fn. 9 ["A declaration not signed under penalty of perjury under the laws of California has 'no evidentiary effect' and can be disregarded."].) Even if considered, the only exhibit Roe offered to show his coworkers read the letter was hearsay and did not specifically state that anyone read the allegations, let alone identify any such person.

Roe next cites two cases to argue that the litigation privilege does not apply because the letter contained criminal threats and misrepresented the existence of criminal proceedings.[4] The first case does not assist Roe as it makes clear that merely suggesting a crime has been committed does not take a communication outside of the litigation privilege. (*Knoell v. Petrovich* (1999) 76 Cal.App.4th 164, 170 [attorney letter demanding extinguishment of an easement that "'may or may not be a forgery'" "did not threaten criminal prosecution" and was "absolutely privileged."].) The other case, *Nguyen v. Proton Technology Corp.* (1999) 69 Cal.App.4th 140, is distinguishable. Nguyen's libel claim arose from a letter in which his former employer accused his new employer of engaging in unfair competition. The letter included a statement that Nguyen had been imprisoned for violently assaulting his wife. (*Id.* at pp. 143–144.) The Court of Appeal found that the reference to Nguyen's "prior criminal history was not privileged under section 47(b)," its

---

[4] Roe does not direct us to language in the letter describing "criminal proceedings."

connection to contemplated unfair competition litigation was "tenuous," and that making the statement was vindictive behavior. (*Id*. at pp. 151–152.)

Here, Roe appears to be arguing that this statement in the letter accused him of a crime: "We are also confident that we will obtain evidence that you engaged in a deliberate effort to mislead [Cordoba] and that you employed accomplices to do so." He focuses on the word "accomplices," which can be used to refer to those who act with another to commit a crime. However, the letter does not threaten Roe with prosecution or mention involvement of law enforcement. Further, the sentence using the term is connected to Cordoba's claims. It does not pull the Attorneys' letter outside the litigation privilege's broad protection.

Because the litigation privilege provided the Attorneys with a full defense to the claims against them, Roe failed to carry his prong two burden. The trial court did not err in granting the anti-SLAPP motion.

## ATTORNEY FEE AWARD

Roe also challenges the trial court's fee award. He argues that the award included fees for work that was duplicative and unrelated to the anti-SLAPP motion. He also argues that the Attorneys' evidence was deficient because their counsel's invoices did not show the hourly rate that was actually billed to the Attorneys.

## A.    Legal Principles – Attorney Fees

A prevailing defendant in an anti-SLAPP motion "shall be entitled to recover [his or her] attorney's fees and costs."

15

(§ 425.16, subd. (c)(1).)  The defendant has the burden of establishing its entitlement to fees and the reasonable amount of those fees.  (*Lunada Biomedical v. Nunez* (2014) 230 Cal.App.4th 459, 486) To calculate the amount of attorney fees, the court begins with a lodestar figure based upon the number of hours reasonably expended multiplied by the reasonable hourly rate prevailing in the community for similar work.  (*Frym v. 601 Main Street LLC* (2022) 82 Cal.App.5th 613, 621.)  The lodestar figure may be increased or decreased depending on a variety of factors, and "the trial court has discretion to determine the amount of reasonable fees to award based on 'a consideration of such factors as the nature of the litigation, the complexity of the issues, the experience and expertise of counsel and the amount of time involved. [Citation.] The court may also consider whether the amount requested is based upon unnecessary or duplicative work.' [Citation.]" (*Ibid.*)

We review the trial court's determination of the amount of the award for abuse of discretion and will not set aside the award absent a showing that it was manifestly excessive in the circumstances.  (*Marshall v. Webster* (2020) 54 Cal.App.5th 275, 285 (*Marshall*).)  The experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is subject to review, it will not be disturbed unless we are convinced that it is clearly wrong.  (*Ibid.*)  An abuse of discretion is shown when the award shocks the conscience or is not supported by the evidence.  (*Ibid.*)

## B.    Analysis

Roe first argues that the Attorneys sought attorney fees for the entire action.  He asserts that 358 billing entries were facially

16

unrelated to the anti-SLAPP motion.  He further asserts 180 billing entries reflect work performed during periods when "no live work" on the anti-SLAPP motion was "pending" from December 12, 2022 to January 27, 2023[5] and from February 9 through 28, 2023.  However, instead of directing us to particular objectionable entries, he cites generally to more than 50 pages of invoices and does not indicate which entries he disputes.

Roe, as the appellant, has the burden to affirmatively demonstrate error and "provide citations to the appellate record directing the court to the evidence supporting each factual assertion." (*Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 684 (*Meridian*); Cal. Rules of Court, rule 8.204(a)(1)(C).)  We are "not required to develop the parties' arguments or search the record for supporting evidence and may instead treat arguments that are not developed or supported by adequate citations to the record as waived." (*Meridian, supra,* 67 Cal.App.5th at p. 684.)  Roe's failure to provide proper record citations impedes us from determining whether the amounts he objects to were accounted for in the trial court's reductions of the lodestar, which, as we will discuss, reduced the requested award by 31 percent.  Roe has forfeited his arguments.

Roe has also failed to show the award was manifestly excessive.  The trial court stated that its determination was based on 18 years adjudicating similar motions and several decades as a litigator in private practice.  It considered the skill

---

[5]     The record belies this contention.  For example, the register of actions indicates that on January 17, 2023, Roe initiated ex parte proceedings to continue the anti-SLAPP motion and to file an oversized brief.  A cursory review of the invoices reveals that the Attorneys billed time to review Roe's papers and attend the hearing.

of the attorneys, commenting their work was "excellent." It found that the $450 hourly rate was "very reasonable." Roe responded that this finding was "within the court's discretion. There is no argument there."

Roe argued at the hearing that most of the time billed was for work unrelated to the anti-SLAPP motion—for example, "meet and confer" efforts, advice regarding a different matter, and for a demurrer. The court addressed these concerns by making two levels of reductions. It began with the total hours claimed, 179.5 hours, and subtracted fees incurred for duplicative efforts, work not designed to extricate the clients from the case, travel, internal conferences, and reviewing and revising documents. Finding the hours still "on the high side," it then applied "about a 10 percent haircut" to reach a reasonable amount. The final award of $56,173 represented 124.83 hours of attorney time, which was significantly less than the $80,775 that the Attorneys requested.

We discern no error in this approach. "When confronted with hundreds of pages of legal bills, trial courts are not required to identify each charge they find to be reasonable or unreasonable, necessary or unnecessary. The party opposing the fee award can be expected to identify the particular charges it considers objectionable. A reduced award might be fully justified by a general observation that an attorney overlitigated a case or submitted a padded bill or that the opposing party has stated valid objections." (*Gorman v. Tassajara Development Corp.* (2009) 178 Cal.App.4th 44, 101.) If a trial court determines that the requested award is too high, it may make across-the-board percentage cuts in either the number of hours claimed or in the final lodestar figure. (See *Kerkeles v. City of San Jose* (2015) 243

18

Cal.App.4th 88, 102.)  Here, the final award—69 percent of the requested award—was not clearly wrong and does not shock the conscience.  (*Marshall, supra,* 54 Cal.App.5th at p. 285.)

Roe also argues that the invoices did not satisfy the Attorneys' evidentiary burden because the counsels' billing rates were redacted.  We are unpersuaded.  First, time records are not required to support a fee award, and an award may be made based on declarations of counsel.  (*Syers Properties III, Inc. v. Rankin* (2014) 226 Cal.App.4th 691, 699.)  Second, Roe is incorrect to the extent he suggests that the Attorneys were required to prove the hourly rate they were actually charged.  "It is well established that an attorney who accepts a reduced rate from a client is not precluded from seeking a reasonable hourly rate pursuant to the lodestar method."  (*Pasternack v. McCullough* (2021) 65 Cal.App.5th 1050, 1055.)  The reasonable market value of the attorney's services is the measure of a reasonable hourly rate.  (*Ibid.*)  This standard applies regardless of whether the attorneys claiming fees charge below-market or discounted rates.  (*Ibid.*)

The Attorneys' counsel attested to 46 years' experience as a trial attorney and that his usual hourly rate in the preceding five years ranged between $450 to $650.  He agreed to a rate of $300 because of a prior relationship with the Attorneys and because their insurance carrier required the lower rate.  Counsel attested to his familiarity with market rates, and that an hourly rate of $450 was at the "low end of the rate scale for similar attorneys of my experience."  Roe offered no contradictory evidence.  The trial court found $450 to be the reasonable value of the services provided, regardless of the rate actually billed.  It was in the best

19

position to make this determination and was within its discretion to do so.

## DISPOSITION

The order and amended judgment are affirmed. The Attorneys are awarded their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MORI, J.

We concur:


ZUKIN, P. J.


COLLINS, J.